2012 Ark. App. 399

Yolanda Lafay PRATT & Kirby Jackson, Appellants

v.

ARKANSAS DEPARTMENT OF HUMAN SERVICES & Minor Child, Appellees.

No. CA 12–172.

Court of Appeals of Arkansas.

June 20, 2012.

Leah Lanford, Attorney at Law, Arkansas Public Defender Commission, Little Rock, for Appellant Yolanda Pratt.

Janet Lawrence, Attorney at Law, Conway, for Appellant Kirby Jackson.

Melissa B. Richardson, Bristow & Richardson P.L.L.C., Jonesboro, and Tabitha McNulty, DHS Office Chief Counsel, Little Rock, for Appellee.

DAVID M. GLOVER, Judge.

Yolanda Pratt and Kirby Jackson appeal from the termination of their parental rights to their son C.J., who was born June 10, 2006. We affirm both terminations.

### Background

This case began[1] in 2010 with DHS taking emergency custody of C.J. amid allegations and counter-allegations that C.J. was living among people who were smoking crack cocaine, in unsafe living conditions, with an abusive, alcoholic father (Kirby) who beat Yolanda with a belt, hit C.J. with his fist, and locked Yolanda in a closet.[2] Yolanda's mental capacity and how it affected her ability to care for C.J. were also at issue. At the probable-cause hearing, the trial court ordered DHS to retain

---

1. The family had been involved previously in a case that was opened on December 15, 2006. According to the DHS affidavit, the earlier allegation was found to be true against Yolanda but unsubstantiated against Kirby. A protective-services case was opened to provide them services.

2. Yolanda subsequently recanted her allegations of abuse, but her recantation was questioned because of her susceptibility to being influenced by others.

custody of C.J. and to develop an appropriate case plan. A guardian ad litem was subsequently appointed for Yolanda. At the adjudication hearing on December 9, 2010, C.J. was determined to be dependent-neglected and Yolanda was found to be significantly low functioning, which raised questions about her ability to be a fit parent. The goal of the case was set as reunification.

At a March 8, 2011 review hearing, the trial court determined that little progress had been made. The court was particularly concerned that Yolanda's "full scale IQ is 55," that she was very dependent, and that Dr. Paul Deyoub did not believe she would be able to be an appropriate parent by herself. In addition, hair-follicle test results for C.J. were positive for cocaine, and the foster parents testified that C.J. had substantial developmental delays and serious dental issues. The court found that DHS had made reasonable efforts to further the goal of reunification, including modified parenting classes to accommodate Yolanda's low-functioning skills, but that she had not benefitted from the services, and that the case was "still not going well." Kirby's status as C.J.'s biological father was established, and an attorney was appointed to represent him.

Then, at the August 23, 2011 permanency-planning hearing, the trial court changed the case goal to adoption, concluding that it remained to be seen whether the parents were minimally qualified to care for C.J., who is a high-needs child.

### Termination Hearing

The termination hearing was held on November 1 and 8, 2011. Twelve witnesses testified. Kirby testified at length. He stated that before C.J. was taken away, he worked with C.J. quite a bit and that C.J. was "going to the potty" more often than he was having accidents. He acknowledged that C.J. had serious dental problems that even affected his ability to eat. Kirby explained that he had been diagnosed with chronic post-traumatic stress disorder and depression, and he acknowledged substance-abuse treatment for marijuana about ten years ago, but denied having a cocaine habit. He said that he had no idea why the VA records stated that he had a daily cocaine habit from 1987 to 1997, and no idea why those records stated that he did not stop using marijuana until 2006 because he stopped using it in 1999; neither did he know why they said that he was an alcoholic, dependent on alcohol, because he was not. He stated that his discharge plan included focusing on his anger; being able to live better with his family; taking care of projects; and being more involved in the community.

Kirby acknowledged that he had talked with DHS representatives for the past year about his home condition. According to him, his plan to maintain stability with his PTSD was to talk to his brother, mother, and pastor, and to go to an outpatient program at the VA on a weekly basis, but he had not started that program yet. On a scale of one to ten, Kirby said that he ranked Yolanda at a seven concerning her level of functioning. He attributed the reason this case was opened in the first place to a "misunderstanding" between him and Yolanda. He described friction between them because Yolanda was doing everything her mother told her to do. Kirby explained that Yolanda sought an order of protection against him but that she lied in her affidavit concerning the protection order; that she also lied to DHS about abuse taking place in their house. He denied abusing Yolanda and offered his opinion that he did not dominate her. He described his anger-management training, what he had learned from it, and his concerns about DHS and its

assessments of his house and the care of C.J. He expressed his belief that C.J. was developmentally delayed but that C.J. would at some point reach the status of an average child or above. He stated that C.J.'s hair-follicle test was positive for cocaine because Yolanda's mother was living in a cocaine- and methamphetamine-infested motel. He announced his intention to stay with Yolanda.

The trial court questioned Kirby about the allegations made by Yolanda (before she recanted them), including the allegations that Kirby kicked her, hit her in the head, bit her, locked her in a closet for one night, hit C.J. in the head and back with his fist; that Kirby had been abusive to her for years; that he had broken her nose and busted her head open in the past; and that he called her "bitches, hoes, and motherfucker," and cursed C.J., too. Kirby responded that he thought Yolanda made those allegations because she was easily influenced by her mother.

Dr. Deyoub, a forensic psychologist, testified that he had prepared psychological evaluations on Yolanda and Kirby. Dr. Deyoub expressed his opinion that Yolanda's recanting of the abuse allegations was not credible, explaining that she could not articulate why she had made the allegations nor why she had recanted. He testified that she had an IQ of 55; that her academic ability was also 55, the lowest score on the WRAT; that she would have trouble making day-to-day decisions; that she would not be able to attend to the day-to-day routines of the child; that he did not believe she had the ability to take care of the child independently; and that the only explanation he could give for how she managed with the child for four years was that Kirby was there. He said that his diagnosis of dependent personality was secondary to her mental challenges; that he believed she had been in a dependent relationship with Kirby for twelve years; that he believed it was an exploitative, controlling relationship; and that the order of protection from domestic court came shortly before DHS got involved.

Dr. Deyoub testified that he had stated in his report that reunification services would not help "because nothing will raise her IQ, and she will not be able to process or take advantage of services." He stated that if Yolanda decided to stay with Kirby, then that presented an additional level of potential harm for C.J.

With respect to his evaluation of Kirby, Dr. Deyoub testified that his IQ was 82; that he had very significant test results for anxiety disorder, obsessive disorder, alcohol dependence, cocaine dependence, and a personality disorder. He said that Kirby admitted that he had used cocaine at some point in his life, but claimed that it was twenty years ago. He stated that his assessment of alcohol dependence was based on Kirby's history; and that Kirby told him he was still drinking but minimized the amount. He said that Kirby had acknowledged that he had been treated at the VA years ago for alcohol and cocaine. Dr. Deyoub said that although Kirby "completely denied" any domestic abuse, he believed there was domestic abuse and that returning C.J. to the same people, with the same relationship, and under the same circumstances without any type of admission of abuse, would be to do so without any remediation. Dr. Deyoub testified that he did not find Kirby to be credible. The only problem Kirby identified to Dr. Deyoub was that Yolanda and her mother "got together to take C.J. away." He expressed his opinion that there would be potential harm if C.J. were returned to Kirby and that, in his view, there would be another case, i.e., that it would happen again.

Mary Giles, Children's Program Director at the learning center that provided full developmental services to C.J. before he was taken from Yolanda and Kirby, testified that she did not have any concerns with the specific physical care C.J.'s parents gave him; that he was functioning at a one-to-two-year-old level; and that even though Kirby told them C.J. was potty trained, she did not consider him ready to be potty trained because he could not cognitively understand the process of potty training. She said that she saw Yolanda interact with C.J.; that she thought Yolanda was doing the best she could based on her developmental level; and that the learning-center staff often gave her additional support. She stated that she did not have any concerns about physical harm to C.J. by his parents, but that she was concerned that they would not be able to fully care for him based on his developmental needs. She said that the learning-center personnel were under the impression that the parents were in denial about C.J.'s actual developmental state, and that with such denial there is concern about an inability to provide proper care. She said that C.J. seemed bonded to them.

Heather Zakrzewski, a special-education instructor, testified that C.J. had been in her class since August; that he received special training to develop daily-living skills and pre-language skills; that he could not speak; that he was not toilet trained; and that she did not see those two things happening in the foreseeable future. She explained that he required constant supervision; that he did not have the fine-motor skills to grasp anything very well; that he was not able to use utensils to feed himself; and that he used his hands to eat. She expressed her opinion that C.J. would probably never catch up to the children in his age group.

Laura Jennings, a physical therapist, testified that C.J. was functioning as an eleven-month-old child on his speech-therapy evaluation, even though he was five years and four days old at the time that particular testing was done. She stated that it was not realistic that C.J. would be able to express to an adult that he needed to go to the restroom; that he was not at a level even at the time of the hearing to be toilet trained, much less a year before that time. She stated that she had observed his rocking motion, and that it was indicative of autistic-like behavior that is usually a calming behavior.

Wendy Childs, an adoption specialist, offered her opinion that C.J. was adoptable, even with his developmental delays. Angela Foy, who works for DHS, testified that she provided parenting training to Yolanda; that she modified the curriculum for Yolanda because she was not able to comprehend the material in the typical course; and that even with those modifications, Yolanda "wasn't getting it." Ms. Foy stated that Yolanda was loving toward C.J., but she stated her opinion that Yolanda could not parent alone.

H. Lynn Hemphill, a licensed therapist, testified that he worked with Kirby concerning anger management; that Kirby had denied being physically abusive to Yolanda, but expressed an awareness that the relationship was not healthy and that it would not be in C.J.'s best interest to continue in the relationship. Hemphill explained that he had learned two weeks prior to testifying that Kirby wanted to participate in couple therapy with Yolanda and that they had decided to stay together. He stated that Kirby had made significant progress in therapy, but that he had not reached the maximum benefit of therapy. He expressed his opinion that Kirby, independently, had the ability to care for C.J., but if he did so in conjunction with Yolan-

da, they would need therapy. He said that if abuse had actually occurred as originally alleged by Yolanda, he would be concerned because they had not undergone any domestic-violence training. He stated that he knew there was a significant age difference between Yolanda and Kirby but that he did not know she was twenty and he was forty-five when they first started dating. He said that he thought it would take two or three more months in order for couple therapy to do as much good as it could so that C.J. could be returned.

Karen Williams, a licensed professional counselor, testified that she had been providing therapy to Yolanda. She stated her belief that Yolanda was easily influenced and said that she was concerned about the stability of the relationship between Yolanda and Kirby and the effect that it would have on their parenting of C.J. Williams questioned Yolanda's recanting of the original allegations of abuse. She stated that Yolanda "definitely [did not] have the ability to parent by herself."

Deborah Isreal, C.J.'s foster parent, testified about the problems C.J. was experiencing when he came into her care and how those problems had improved under her care.

Jessica Warren, the family-service worker assigned to the case, testified that she believed it was in C.J.'s best interest to terminate the parental rights. Among her concerns were the opinion that Kirby did not fully understand the severity of C.J.'s needs; that Yolanda was not capable of meeting C.J.'s needs; her belief that the original allegations of abuse were true, even though Yolanda had recanted them; and that those issues had not been addressed because of the recantation. She also expressed her belief that C.J. was adoptable. She acknowledged that the couple had a stable income based on their

disabilities; that Yolanda had cooperated in the services provided and consistently visited with C.J.; that Yolanda never told her that Kirby had abused her; and that she had never witnessed Kirby act inappropriately toward Yolanda. She also stated that C.J. is very excited to see his parents and that the visits go well overall. She contradicted earlier testimony that C.J. could not feed himself with a fork or spoon.

Dorothy Jackson, C.J.'s paternal grandmother, testified that she had helped care for C.J. from the time he was born; that when he was taken from the home, he was very independent; and that he was feeding himself and had started potty training. She said that she had never seen her son abuse Yolanda or C.J. and that Yolanda had never told her that he did.

At the conclusion of the hearing, Yolanda and Kirby's parental rights were terminated. The trial court found that C.J. had been adjudicated dependent-neglected, had continued out of the home for twelve months, and despite a meaningful effort by the Department to rehabilitate the parents and correct the conditions that caused removal, those conditions had not been remedied by the parents. The court further found that subsequent to the filing of the original petition for dependency-neglect, other factors or issues arose which demonstrated that C.J.'s return to the family home was contrary to his health, safety, or welfare and that, despite the offer of appropriate family services, the parents had manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate their circumstances, which prevented C.J.'s return to the family. In particular, the court found that, despite the couple's love and affection for C.J., Yolanda was not minimally fit, not a proper custodian, and could not care for a small child with high needs;

that Kirby's testimony was not credible concerning his use of drugs and alcohol; that Kirby did not have a realistic view of the degree of C.J.'s developmental delays and therefore would not properly address those needs; and that because both C.J. and Yolanda would need a substantial amount of care, Kirby's PTSD would prevent him from successfully dealing with that level of stress. The trial court also found by clear and convincing evidence that it was in C.J.'s best interest to terminate the parental rights, specifically considering the likelihood that C.J. would be adopted and the potential harm to his health and safety if he were returned to his parents' custody.

*Standard of Review*

■ Termination of parental rights is an extreme remedy and in derogation of the natural rights of the parents; however, parental rights are not to be enforced to the detriment or destruction of the health and well-being of a child. *Reed v. Arkansas Dep't of Human Servs.*, 2012 Ark. App. 369, —— S.W.3d ——. Grounds for termination of parental rights must be proved by clear and convincing evidence. *Id.* It must also be proved that termination of parental rights is in the child's best interest. *Id.* Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Id.* When the burden of proving a disputed fact is by clear and convincing evidence, our inquiry is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *Id.* We give due regard to the opportunity of the trial court to judge the credibility of the witnesses. *Id.* Where there are inconsistencies in the testimony presented at a termination hearing, the

resolution of those inconsistencies is best left to the trial judge, who heard and observed those witnesses first-hand. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.*

*Yolanda*

In Yolanda's appeal, she contends that the trial court was fully aware of her mental challenges yet did not make sure that she was offered reasonable accommodations under the Americans with Disabilities Act, which made the termination of her parental rights premature and in error. We do not address the merits of this issue.

■ First, Yolanda acknowledges that her argument was not raised before the trial court; however, she contends that it falls within the third exception to the contemporaneous-objection requirement set forth in *Wicks v. State*, 270 Ark. 781, 606 S.W.2d 366 (1980), and that the issue should therefore be addressed by this court. We do not agree. The third exception set forth in *Wicks* relates to the trial court's duty to intervene, even without an objection, to correct a serious error. *Wicks* exceptions are rarely applied. *Strickland v. State*, 2010 Ark. App. 599, 378 S.W.3d 157. In making her argument, Yolanda relies on *Baker v. Arkansas Department of Human Services.*, 2011 Ark. App. 400, 2011 WL 2140380. However, the *Wicks* discussion in *Baker* arose from an earlier no-merit setting and stands only for the proposition that it may not be frivolous to argue that the *Wicks* exception to the contemporaneous-objection rule might apply in a termination case where an issue was not preserved.[3]

3. As we explained in *Baker*: "Baker's attorneys have misinterpreted the significance of

Here, the trial court did not ignore Yolanda's mental deficiencies. Rather, it acknowledged and focused on them and appointed a guardian ad litem to represent her. Yolanda attempts to minimize special efforts that were made on her behalf, but there was testimony presented that specific efforts were made to adapt the parenting training for Yolanda. In fact, her trial counsel acknowledged that she had had access to services and had benefitted from them. No argument of the nature raised here was ever presented to the trial court, and, although Yolanda now lists several services that should have been provided to her, she did not request any of them below. We are simply not convinced that the trial court committed a flagrant error that would justify the very rare application |₁₄of a *Wicks* exception in this case. Consequently, we do not address the merits of Yolanda's argument on appeal because it was not properly preserved. *See Gilmore v. Arkansas Dep't of Human Servs.*, 2010 Ark. App. 614, 379 S.W.3d 501.

### Kirby

■ Kirby contends in his appeal that DHS did not prove his own lack of compliance with the case plan and that there was not sufficient evidence to support the trial court's conclusion that termination was in C.J.'s best interest. We disagree.

■ First, noncompliance with the case plan is not a prerequisite for termination of parental rights. What is of most concern is whether completion of the case plan achieved its goal of making the parent capable of caring for the child. *Tucker v.*

*Arkansas Dep't of Human Servs.*, 2011 Ark. App. 430, 389 S.W.3d 1.

■ Second, the two factors a trial court must consider in dealing with "best interests" determinations are adoptability and potential harm. Kirby does not challenge the adoptability prong. Rather, he argues that DHS provided no proof that C.J.'s health and safety were at risk with Kirby.

Here, although Yolanda's allegations of abuse were subsequently recanted, there was testimony that the recantation was not reliable. Moreover, the trial court found that Kirby was not credible, concluding that his testimony differed significantly from other proof, particularly regarding drug and alcohol use. The trial court also concluded that Kirby had an unrealistic view of his own child's capabilities, did not understand the child's |₁₅significant needs, and therefore would not properly address them. The court further factored in Kirby's PTSD, which it felt would prevent Kirby from being able to deal with the stress of caring for C.J.'s high needs, particularly coupled with Yolanda's needs and her inability to fully care for C.J. The trial court terminated Kirby's parental rights because C.J. was adjudicated dependent-neglected, he had been outside the home for at least twelve months, and despite DHS's efforts to rehabilitate Kirby, the conditions had not been remedied. The court found that there was a likelihood of C.J. being adopted, a finding not challenged here, and we find no clear error in its further conclusion that there was the

---

our rebriefing order in this case.... Our denial of a *Linker–Flores* petition and order to submit an adversarial brief means nothing more than that we have discovered an issue that the petitioning attorney could advance without violating Arkansas Rule of Profession-

al Conduct 3.1. There is, however, a great distinction between an appeal that we deem to be meritorious and one that is not so frivolous as to subject the attorney who advances it to discipline." *Baker*, 2011 Ark. App. 400, at 3, 2011 WL 2140380.

potential for harm to C.J. if he were returned to Kirby's care.

Affirmed.

WYNNE and BROWN, JJ., agree.