
# ARKANSAS COURT OF APPEALS

DIVISION IV
**No.** CV-13-938

| | |
|---|---|
| | **Opinion Delivered** February 26, 2014 |
| RICHARD WEATHERS and LINDA VONDRAN | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, EIGHTH DIVISION [NO. 60 JV-12-1249] |
| APPELLANTS | |
| V. | |
| | HONORABLE WILEY A. BRANTON, JR., JUDGE |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES | |
| APPELLEE | AFFIRMED |

## BRANDON J. HARRISON, Judge

Linda Vondran and Richard Weathers appeal a Pulaski County Circuit Court order that terminated their parental rights to their child D.V. We affirm.

### I. *Background*

This case started with a telephone call to the state child-abuse hotline. The anonymous caller alleged that Linda Vondran was mentally challenged and unable to care for D.V., a newborn. The Arkansas Department of Human Services (DHS) began to investigate these allegations in June 2012 while Linda and D.V. were still in the hospital under observation. DHS's investigative report states that the hospital staff was concerned about Linda's behavior and that she had not been feeding the baby. A few days later the hospital admitted Linda into its psychiatric ward because of suicidal ideations. DHS exercised an emergency hold on D.V. Linda's mental condition and how it affects her ability to care for D.V. is a primary issue in this case. Also at issue here is the behavior of

D.V.'s father, Richard Weathers. During its initial investigation, DHS learned from Linda that Richard was in prison because he was "mean to her" and had "pulled a knife" on her while she was pregnant with D.V.

The circuit court granted DHS's ex parte request for emergency custody on 25 June 2012. Three days later the court entered an interim order, requiring that Linda submit to a psychological evaluation and random drug-and-alcohol screenings. The court also ordered DHS to perform DNA testing to see if Richard Weathers was D.V.'s father, and it prohibited Richard from contacting D.V.

In July 2012 the court adjudicated D.V. dependent neglected due to the emergency conditions that led to his removal from his mother's custody. The court found that Linda was not emotionally equipped to care for D.V. and was admitted to a psychiatric ward because of suicidal ideations. The court found that, based on Linda's testimony at the hearing, she was "unable to meet minimum requirements of being a parent due to low mental functioning (which was obvious to the Court), particularly given the fact that we are dealing with a newborn child who is 100% dependent on the caregiver to meet his every imaginable need." The court's concern for D.V.'s welfare was also fueled by its finding that Linda was a "domestic violence victim and intends to return to her abuser." The court advised Linda that a reunion with D.V. "will be more difficult for her to achieve" if she remained with Richard, that she did not have an unlimited amount of time to pursue reunification with D.V., and that the court had "other means of achieving permanency . . . which include[s] termination of parental rights and adoption." The court granted Linda supervised visitation with D.V. but ordered that Richard have no

contact with the child upon his release from prison. The court also set the case goal as reunification and approved DHS's case plan.

At a November 2012 review hearing, the court determined that no progress had been made. It found that Linda had subjected D.V. to "aggravated circumstances" based on Linda's testimony and her psychological evaluation. The court was particularly concerned that Linda continued to express suicidal ideations and that she intended to reunite with Richard when he was released from prison. Dr. Paul Deyoub, who conducted Linda's psychological evaluation, wrote that Linda's "IQ was 63, her adaptive ability is just as low, she has no concept how to live independently, how to take care of the baby, how to keep herself and the baby safe, or how to provide for this child . . . she is not capable of taking care of this child and the baby should not be placed with her." In a written order, the court found that DHS had made reasonable efforts to further the goal of reunification, including foster-care placement and board payment, referrals for counseling, a referral for DNA paternity testing, psychological evaluations, and a referral for parenting classes, but that these services were unlikely to result in a successful reunification because of Linda's limited participation. The court ordered her to follow up on her individual counseling and "get whatever mental health services she can as she needs to be under regular mental health services." The court also wrote: "the mother has her work cut out for her," but that it intended to give her more time to try to reunite with D.V. The court's order also stated that if Richard was determined to be the biological father of D.V., then DHS was to provide services for him too.

In December 2012, Linda's court-appointed attorney moved the court to appoint Linda an attorney ad litem because of concerns about her low IQ and the results of Dr. Deyoub's psychological evaluation. The court granted the request and appointed a attorney ad litem for Linda.

At the permanency-planning hearing in April 2013 the circuit court changed the case goal from reunification to adoption, concluding that there had been "a lack of material progress" and that a return of D.V. to his mother's custody would be contrary to his welfare and not in his best interest. The court found that Linda had made a statement about intending to harm D.V. and reasoned that "[i]t appears to the Court that the mother is unable to take care of herself much less a child."

The permanency-planning order stated that Richard Weathers is D.V.'s biological father and that DHS had submitted reports on Richard. The court considered the results of Richard's psychological evaluation in its decision to change the case goal from reunification to adoption. Dr. Deyoub diagnosed Richard with borderline intellectual functioning and antisocial-personality disorder. The court relied on Dr. Deyoub's conclusion that Weathers "is an antisocial individual with a substantial history of criminal activity, domestic abuse, incarceration, drug dealing, and infidelity. Almost every area of his life is affected by his antisocial personality and conduct. I could not think of a worse fate for [D.V.], at 9 months of age, than to be placed with either of these two people [Linda and Richard]. I am not recommending any services for Richard Weathers and recommend no contact with [D.V.]"

The court ordered Richard to continue in therapy and counseling, attend anger-management counseling at DHS's expense, attend domestic-abuse counseling at DHS's expense, attend parenting classes, submit to random drug-and-alcohol screens, clear up his criminal charges, and maintain stable and appropriate housing and income. The court ordered Linda to attend individual therapy and counseling, attend parenting classes, submit to random drug-and-alcohol screens, stay on her medications, and comply with medication management as recommended.

For DHS's part, the court concluded that it had made reasonable efforts to provide reunification services between the parents and D.V. The court found that DHS had provided referrals for counseling, a referral for DNA paternity testing, psychological evaluations, referrals for parenting classes, worker visits, psychiatric and medication management, drug screens, daycare transportation, car seat, clothes voucher, and medical services.

DHS petitioned to terminate Linda Vondran's and Richard Weathers's parental rights to D.V. in May 2013, and the court held a termination hearing two months later.

## II. *Termination Hearing*

Five witnesses testified during the July 2013 termination hearing. Vicki Lawrence, Linda's therapist, testified first. She said that Linda had an initial assessment in early May 2013 and had only attended one session since. Lawrence told the court that Richard had refused to bring Linda to therapy, which greatly limited her contact with Linda. The "number-one concern" Lawrence had for Linda was that she was in an abusive relationship with Richard and that she was scared to leave. Lawrence diagnosed Linda as a

physical-abuse victim with major depression and borderline intellectual functioning. She said that Linda recognized that she was unable to take care of D.V. without help. Linda reportedly told Lawrence that she would not consider going to a battered women's shelter but would consider an "adult-care situation." Lawrence told Linda that the first step would be to "leave the abusive relationship." Despite this advice, Linda told Lawrence that she had no immediate plans to separate from Richard.

Richard's therapist, Kimberly White, testified too. White told the court that she discontinued couples counseling with Richard and Linda after two sessions because Richard was disruptive and inappropriate; she also said that Linda was afraid of Richard. White testified that Richard was dishonest, manipulative, played the victim, was extremely defensive, and did not take responsibility for his decisions. White summarized her time with Richard this way: "[H]is therapy was not successful."

Shanesha Arbor, the DHS caseworker, also testified during the termination hearing. She said that Linda had visited D.V. consistently while he was in foster care. Linda had obtained a no-contact order after the 2012 knife incident but dropped it when she decided to move in with Richard. She then reportedly told Arbor that she wanted to leave Richard but could not. According to Arbor, Richard and Linda had been living together since March 2013 and they did not report truthfully about their living situation at the permanency-planning hearing. Arbor reported that the home that Richard and Linda shared was well maintained and appropriate, and both parents had adequate sources of income through disability payments.

Arbor stated, without objection, "I have provided this family counseling, psychological evaluations, drug screens, approved foster home with board payment, day care, transportation, clothing voucher, medical, and DNA testing." Arbor said that DHS did not believe that Linda is able to care for D.V. on her own because she didn't seem to have anybody to support her, that the domestic violence between Richard and Linda would create an unstable environment for D.V., and that termination of their parental rights is in D.V.'s best interest. She also told the court that D.V. was an adoptable, normal one-year old child.

Linda testified. As a witness, she admitted lying to the court about her living situation at the permanency-planning hearing. "I don't know if it's okay for [Richard] to hit me. I stay with him because I love him . . . I don't think I want to leave." She spoke of her desire to parent D.V. but said she needed someone to show her how to change a diaper, how much to feed him, and "just somebody showing me." She testified that Richard was not a danger to D.V., that she was okay living with Richard, and that she felt she could care for D.V. with some help.

Richard took the witness stand and denied physically abusing Linda. He also spoke of his desire to parent D.V. as he had his other nine kids, the oldest of whom is thirty. He testified that he had a good home and adequate income to care for D.V. He denied having any antisocial traits or anger-management issues. "I'm normal just like everybody else" and "[Linda] will say I'm mean, but it's only for her best interests." He acknowledged that Linda would need some "guidance" but believed that "both of us could raise the baby." On cross-examination, Richard admitted that he pled guilty to

aggravated assault against Linda for wielding a knife during a dispute with her while she was pregnant, a plea for which he spent a year in prison. He also admitted returning to jail in 2013.

The court received Richard's psychological examination as evidence at the termination hearing. That report states that the examiner was concerned that Richard wanted "to dominate a mentally retarded woman, 30 years younger than him."

In closing arguments, Linda's attorney told the court: "The only thing we're asking is just a little more time to investigate possible placement of my client into an adult-services program for the possibility that she could have help in raising her son." Linda's attorney ad litem expressed grave concern about Linda's physical safety and stated,

> Your Honor, I can't imagine that she would be able to take care of this baby in an abusive home without services—without the amount of services that she would need to protect both herself and this child. Sadly, I'm going to have to agree with the recommendation of the department for rights to be terminated. We don't have the framework necessary to protect my client and this child.

Richard's attorney asked the court to dismiss DHS's petition and reinstate the case goal of reunification.

At the hearing's conclusion, the court terminated Linda's and Richard's parental rights. It found clear and convincing evidence that D.V. had been adjudicated dependent-neglected, had continued out of the home for twelve months, and despite a meaningful effort by the Department to rehabilitate the parents and correct the conditions that caused the removal, those conditions had not been remedied. The court further found that after the original petition for dependency-neglect was filed, other issues arose that demonstrated D.V.'s return to his parents was contrary to his health, safety, or welfare and that Richard

and Linda had manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate their circumstances. Finally, the court found that Richard and Linda had subjected D.V. to aggravated circumstances—namely, that there was little likelihood that services to the family would result in successful reunification.

For Linda, the court found that "the bottom line is that it is clear from Dr. Deyoub's report as well as Ms. Lawrence's report and testimony, that the mother could be given the rest of the time in the world to work on services, and still would not be able to rise to the level necessary to provide the minimum standard of care required to raise her child." In particular, the court found that Linda intended to stay with an abuser and that dismissing the order of protection was further proof that she intended to remain in a harmful environment.

Richard, according to the court, "lacks credibility, has an extensive criminal history, and denies issues that demand resolution in therapy (specifically, domestic abuse) which works to prevent him from addressing his problems. Whether the Court gave him ninety days or a hundred-eighty days, it would make no difference."

The court also found by clear and convincing evidence that it was in D.V.'s best interest to terminate Linda and Richard's parental rights, and it specifically considered the likelihood that D.V. would be adopted and the potential harm to his health and safety if he were returned to his parents' custody.

III.  *Legal Analysis*

Termination of parental rights is an extreme remedy and in derogation of the natural rights of the parents; but parental rights will not be enforced to the detriment or

destruction of a child's health and well-being. *Pratt v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 399, 413 S.W.3d 261. DHS must prove the statutory grounds for termination of parental rights by clear and convincing evidence and that termination of parental rights is in the child's best interest. *Id*. Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction that the allegation has been established. *Id*. When the burden of proving a disputed fact is by clear and convincing evidence, we ask whether the circuit court's finding on the disputed fact is clearly erroneous. *Id*. We defer to the circuit court's assessment of witnesses' credibility. *Id*. Resolving inconsistencies in testimony is best left to the circuit judge. *Id*. A finding is clearly erroneous when, although there is evidence to support it, we are left with a definite and firm conviction that a mistake has been made. *Id*.

### A. Linda Vondran's Argument

Linda specifically argues that the court was fully aware of her mental challenges yet did not ensure that she was offered reasonable accommodations under the Americans with Disabilities Act (ADA). Because DHS failed to provide her with meaningful services, Linda says, all three statutory grounds for terminating her parental rights are unsupported.

Linda acknowledges that she did not raise her ADA argument before this appeal but argues that it falls within the third exception to the contemporaneous-objection requirement set forth in *Wicks v. State*, 270 Ark. 781, 606 S.W.2d 366 (1980) and *Baker v. Arkansas Department of Human Services*, 2011 Ark. App. 400. The exception she presses in this appeal, the third *Wicks* exception, deals with a court's duty to intervene, even without an objection, to correct a serious error. The serious error that Linda identifies is that

neither DHS nor the court provided her with reasonable accommodations under the ADA. Linda cites *Baker* as authority that supports an application of the *Wicks* exception in this case. But this court, in *Pratt v. Arkansas Dep't of Human Servs.*, 2012 Ark. App. 399, at 13, 413 S.W.3d 261, 263 has already distinguished *Baker*: "the *Wicks* discussion in *Baker* arose from an earlier no-merit setting and stands only for the proposition that it may not be frivolous to argue that the *Wicks* exception to the contemporaneous-objection rule might apply in a termination case where an issue was not preserved." Our supreme court has never applied a *Wicks* exception in a DHS termination case when the parents are represented by counsel.

A *Wicks* exception will not apply absent a flagrant error so egregious that the circuit court should have acted on its own initiative. *Pratt*, *supra*. To qualify for ADA accommodations in a DHS case, a parent must demonstrate that she has a mental impairment that substantially limits one or more of her major life activities. *Sowell v. Ark. Dep't of Human Servs.*, 96 Ark. App. 325, 329, 241 S.W.3d 767, 770 (2006); 42 U.S.C. § 12102(2) (2012). Linda requested some special services for adult-care living arrangements, but her request was not formally made until closing arguments at the close of the termination hearing—and at no point did either of her attorneys raise the ADA accommodations argument. Moreover, the circuit court did not ignore Linda's mental deficiencies. The court specifically acknowledged them in its adjudication order. The court further acknowledged issues with Linda's mental status by appointing her an attorney ad litem to represent her in addition to her appointed counsel. The circuit court

did not act in a manner that flagrantly prejudiced Linda so as to justify us applying the third *Wicks* exception. *See Pratt*, *supra*.

Regarding inadequacy of the services DHS provided, Linda points us to her objection at the April permanency-planning hearing that DHS could not provide proof of a counseling referral. She also states that DHS "did virtually nothing to assist" her and that she should have received services from programs specifically geared toward individuals with mental disabilities. Linda did not object, during the termination hearing, to any DHS services-related issue. So any issue is waived. *Gilmore v. Arkansas Dep't of Human Servs.*, 2010 Ark. App. 614, 379 S.W.3d 501. And because Linda has not appealed the court's permanency-planning order, any objection she made about the counseling referral in April is not preserved. *Velazquez v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 168.

To the extent that Linda argues that DHS did not prove the first termination ground because it did not provide her with meaningful access to reunification services under Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(*b*), we affirm the termination on a different ground because proof of only one statutory ground is sufficient to terminate parental rights. *Dawson v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 106, 391 S.W.3d 352. The statutory ground that we affirm is the "other factors" ground:

> [O]ther factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that return of the juvenile to the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent return of the juvenile to the custody of the parent.

Ark. Code Ann. § 9–27–341(b)(3)(B)(vii)(a) (Repl. 2008).

SLIP OPINION

We affirm the court's termination of Linda's parental rights under section 9-27-341(b)(3)(B)(vii)(*a*). The court found that after DHS had taken custody of D.V., Linda intentionally dismissed the order of protection, "lied to the court," moved in with Richard, and refused to leave even though the risk of harm was great. Linda was in an abusive, harmful relationship that she refused to leave even at the cost of not having her child returned to her. She acknowledged as much to the circuit court. She said, "I wouldn't ask Richard to leave." Therapist Vicki Lawrence told Linda that the first step to regaining custody of D.V. would be to "leave the abusive relationship" and provided her housing and adult-care options. Linda nevertheless told the court that she saw no reason to leave Richard. We affirm the court's decision to terminate Linda's parental rights on the statutory "other grounds" provision given this record.

In a footnote in her brief, Linda states that she does not challenge the court's best interest finding on adoptability but "denies that D.V. would have been subject to potential harm if returned to her care after the offer of meaningful services." No authority for this undeveloped proposition is provided, so we do not address it. *See Flanagan v. State*, 368 Ark. 143, 243 S.W.3d 866 (2006). The court's finding that a termination of Linda's parental rights was in D.V.'s best interest is therefore affirmed.

## B. Richard Weathers's Argument

Richard argues that DHS did not prove that he failed to comply with the case plan and that DHS did not prove the statutory grounds needed to terminate his rights. He does not challenge the court's conclusion that a termination was in D.V.'s best interest.

A court may terminate a parent's rights even if the parent has complied with the case plan because parental rights will not be enforced to the detriment of a child's health and well-being. *Friend v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 606, 344 S.W.3d 670. The critical question is whether a parent's completion of the case plan has achieved the goal of making the parent capable of caring for the child. *Tucker v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 430, 389 S.W.3d 1. As we said earlier, DHS must prove by clear and convincing evidence at least one statutory ground in order to terminate Richard's parental rights. Ark. Code Ann. § 9-27-341(b)(3)(B). It did so.

We affirm the court's termination of Richard's parental rights based on the court's finding of aggravated circumstances. In our juvenile code, "aggravated circumstances" means that "a child has been abandoned, chronically abused, subjected to extreme or repeated cruelty, or sexually abused, or a determination has been made by a judge that there is little likelihood that services to the family will result in successful reunification[.]" Ark. Code Ann. § 9-27-303(6) (Repl. 2009); Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)(a)(3)(A)−(B)(i) (Repl. 2009). Here, the circuit court focused on the last facet of aggravated circumstances; it concluded that there was little likelihood that the services to the family would result in successful reunification. Because a termination of parental rights is an extreme remedy and in derogation of the natural rights of the parents, there must be more than a mere prediction or expectation by the circuit court that reunification services will fail. *Yarborough v. Ark. Dep't of Human Servs.*, 96 Ark. App. 247, 254, 240 S.W.3d 626, 630−31 (2006).

We hold that there was clear and convincing evidence that reunification services were unlikely to succeed. Richard never fully complied with the case plan because he refused to participate meaningfully in counseling and prevented Linda from receiving counseling. The court found that Richard had an unrealistic view of his own past and future capabilities, did not understand the significance of his violent tendencies, and refused to acknowledge that he had abused Linda. Richard's therapist concluded that any attempt to counsel Richard was "not successful." Dr. Deyoub did not recommend any services for Richard and opined that Richard should have no contact with D.V. The results of Richard's psychological evaluation, his therapist's testimony, and even his own testimony support the court's finding that further services would not likely help Richard and that a termination was necessary to protect D.V.

The court also found that D.V. was likely to be adopted and that D.V. would be in danger if placed with Richard. Richard does not challenge these findings, and we affirm the court's finding that terminating Richard's parental rights was in D.V.'s best interest.

IV. *Conclusion*

The circuit court's decision to terminate Linda Vondran's and Richard Weathers's parental rights as to D.V. is affirmed.

Affirmed.

WOOD and WHITEAKER, JJ., agree.

*Huffman Butler, PLLC*, by: *Brian A. Butler*; and *Didi Harrison Sallings*, Arkansas Public Defender Commission, for appellants.
*Tabitha Baertels McNulty*, DHS Office of Policy; and *Chrestman Group, PLLC*, by: *Keith Chrestman*, for appellees.