Cite as 2021 Ark. App. 318

# ARKANSAS COURT OF APPEALS
DIVISION IV
**No.** CV-21-67

| | |
|---|---|
| GARAKASA HOGGATT<br><br>APPELLANT<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD<br><br>APPELLEES | **Opinion Delivered** September 8, 2021<br><br>APPEAL FROM THE BENTON COUNTY CIRCUIT COURT [NO. 04JV-19-262]<br><br>HONORABLE THOMAS E. SMITH, JUDGE<br><br>AFFIRMED |

## BRANDON J. HARRISON, Chief Judge

Garakasa Hoggatt, who goes by the name Kasey, appeals the Benton County Circuit Court's decision to terminate her parental rights. Kasey challenges the statutory grounds for the termination and argues that it was in not in her two-year-old daughter's best interest. We affirm.

I.

In June 2019, Kasey and the Arkansas Department of Human Services (DHS) stipulated that DP was a dependent-neglected juvenile. DP was removed from Kasey's custody because she had been living in an unsanitary home infested with insects and rodents in Maysville, Arkansas. The home was also occupied by Kasey's brother, who is a registered sex offender, and Kasey's significant other, Robert Pritchard. DHS provided Kasey with community-resource referrals, healthy-family services, transportation, hygiene supplies, cleaning supplies, budgeting help, medical and dental services, case-management services,

homemaker services, individual counseling, and visits with her daughter. In its June 2019 adjudication order, the circuit court noted that the dirty house needed to be cleaned by the three nonworking adults living in the home and that DP could not be returned to a home occupied by a sex offender.

In September 2019, the court found that Kasey had not made enough progress in cleaning the Maysville house and gave Kasey one month to fix the trashed house or to find a new residence. DHS was ordered to coordinate with Kasey's landlord to treat a significant roach problem.

Maysville is somewhat near Bentonville, Arkansas, where the DHS office and family-service providers are located. In November 2019, two DHS caseworkers and a child-advocacy volunteer arrived in Maysville to help Kasey clean up dead roaches, feces, and decayed rats. The three workers also emptied Kasey's refrigerator, threw away trash, and cleaned the bathroom, among other things. According to DHS caseworker Brittney Mather, it took Kasey nearly two hours to get out of bed after they arrived. She said that Kasey came out of the bedroom only when they unplugged the music she was listening to and that Kasey would go from one box to the other entertaining herself with her pet turtle instead of cleaning. Mather said she tried to emphasize to Kasey that they were there to "do this for [her]" and help her get her child back. Mather explained that a homemaking service worker had previously tried to teach Kasey how to clean, but that "didn't really work very well." Pictures from the Maysville November 2019 collective clean-up effort were entered into evidence during the termination hearing.

2

In December 2019, Kasey agreed to move from Maysville to an apartment in Bentonville. A no-contact order was entered between Kasey and her brother. DHS paid for all expenses related to Kasey's move to Bentonville—including paying her first month's rent and the deposit for the apartment. A December 2019 review order notes: "This is a critical time. The house must be kept clean of dirt, food, and animals. [Kasey] must prove that [she] can keep the house clean." To further this goal, the circuit court ordered that Kasey move nothing from her old house into the new apartment. Additionally, DHS was ordered to pay for the electricity to be turned on in the apartment. To help with the fresh start, a DHS caseworker took Kasey shopping at Goodwill for items that she needed for the apartment. The court received photos of the sparse and clean Bentonville apartment that had been taken in December 2019 as evidence against Kasey during the termination hearing.

Throughout the case, Kasey's mental and physical health was at issue. A psychological evaluation on Kasey was completed very early in the case, and the evaluator, Martin T. Faitak, Ph.D., testified against Kasey during the termination hearing. The testing performed by Dr. Faitak showed that Kasey has a positive bias—meaning that she denies problems that most people admit. Kasey also met the criteria for the diagnosis of a dysthymic disorder, which is a mild chronic depression. Dr. Faitak noted that Kasey tended to blame other people instead of taking responsibility for her own behavior, that she scored high for physical problems related to stress, and that she had more fearfulness than most people. He estimated that her intellectual functioning is average to low average. Dr. Faitak recommended that Kasey complete home-parent training and that she attend individual counseling sessions to focus on her responsibility and commitment to parenting. Kasey,

however, did not attend these individual counseling sessions that were recommended by Dr. Faitak and subsequently ordered by the court. Caseworkers and other volunteers frequently described Kasey as angry and resistant to any instruction or assistance. Kasey has suffered trauma in her life. She has also had previous mental-health diagnoses and was under the protection of a guardianship until her mother died a few years before this case started.

As far as physical health, Kasey has a seizure disorder, which cannot be treated successfully with medication. As a result, she is disabled. DHS provided, among other things, medical assistance to Kasey by helping with scheduling and transportation and providing a personal aide when she had her gallbladder removed. DHS also helped Kasey with changing clothes, doing laundry, fixing eyeglasses, and other matters related to personal hygiene, showering, and cleaning. Kasey struggled to take care of her own health and hygiene needs independently and proactively. As the case progressed, Kasey had more problems walking and moving, which she reported were caused by nerve damage from an epidural. At times, Kasey was physically not able to keep up with DP. She also kept an odd schedule and slept a lot during the middle of the day.

Throughout the case, the main issue remained the home's environment. Court Appointed Special Advocates (CASA) volunteers visited Kasey's home approximately fourteen times throughout the case. Additionally, DHS caseworkers went into the home at least twice a week. A voluminous number of pictures of Kasey's residence taken over the course of the case were entered as evidence during the termination hearing. Several witnesses with direct knowledge of the home's condition also testified.

4

The bottom line was that Kasey was unable to maintain her home in a sanitary and safe manner even after she moved to a clean apartment in Bentonville in December 2019. By the end of January 2020, the floors and toilet were dirty and laundry had piled up. By February 2020, there was a broken window and rotten food in the refrigerator. By May 2020, trash abounded, many open containers of tobacco spit were strewn about, and feces were found in the trash can. Pictures from May 2020 also showed debris on the kitchen floor, a dirty toilet, a messy bedroom, and an overflowing refrigerator containing a cake that a caseworker testified had been in Kasey's refrigerator since DP's birthday party two months before. And there were piles of laundry that smelled like urine.

Pictures taken from June 2020 to August 2020 showed increasing messiness and dirtiness. In September 2020, some attempt was made to throw away expired food, but the overall condition of the home remained the same according to DHS testimony during the termination hearing. Other safety issues such as outlet covers and smoke alarms had not been adequately addressed by Kasey even though she had received instruction on those issues. According to DHS, Kasey did not have adequate supplies and had not prepared her home well enough for DP to return, although there was some testimony that Kasey had a crib, a blanket, and a box of diapers to prepare for DP's return.

All visits between Kasey and DP were supervised during the case. The in-home visitation between Kasey and DP occurred two days a week for a total of four hours a week. This location was primarily for the convenience of DHS. Kasey is unable to drive because of her seizures and needed transportation to the DHS office for visitation. Moving the visitation from the DHS office in Bentonville to Kasey's home also had the added benefit

5

of reducing Kasey's nervousness. At the termination hearing, DHS agreed that having the visits in the home made it better for DP and for Kasey.

During a July 2020 supervised visit in the home, DP found a rope lying around and put it on her shoulders and around her neck. In an early September 2020 visit, DP wrapped a shoestring connected to a toy train around her neck, and it left a mark. Pictures of these events taken by the visitation supervisor were entered into evidence during the termination hearing. The visitation supervisor was concerned that Kasey did not address these safety issues during the supervised visitation and that she had to intervene to protect DP. The case never progressed to allow Kasey unsupervised visitation with DP or a trial placement in the home.

On 29 September 2020, which was the first day of the termination hearing, Kasey testified that her house was clean. The circuit court received pictures that Kasey took that day as evidence in the termination case. According to Kasey, she cleaned her home "every day" and insisted that it was going to "stay clean." She also agreed that Caseworker Mather had told her she had done everything she needed to get DP back. She said that she had learned many things through the parenting classes offered to her. Kasey also testified that she had given birth to two other children—one in the woods in a park and one in her aunt's front yard—but she did not have custody of them or records of their births. She testified that she was "too busy" to go to counseling. When asked if she had any issues that counseling could have addressed that keep her from being a good parent to DP, Kasey replied, "No. I think I'm a pretty good mom."

6

In addition to the unsanitary environmental issues involved in Kasey's upkeep of the home, DHS caseworker Mather described Kasey's lack of routine as problematic for caring for a child. For example, Mather was concerned that when she arrived at the house, Kasey would still be sleeping at noon and be extremely irritable when woken up. CASA volunteers were also concerned about Kasey's outbursts and hostility and Kasey's sleeping during visits. Lindsey McDonald, a parent educator, performed weekly visits in Kasey's home through a program called Healthy Families. She testified that Kasey had participated for about a year with the program, that she had interacted appropriately, and that she missed a few visits but no more than was typical. Mather, however, said that Kasey's significant other, Robert Pritchard, engaged in more parenting than Kasey did.

Caseworker Mather testified that Kasey "doesn't really even have the umph in herself to take care of her own needs"; Kasey had let the gallbladder issue "get way too far" before she was forced to take care of it; and Kasey is depressed and does not seem to want to get out of bed. She explained that Kasey would buy or pawn "luxury" items like a Nintendo Switch, a PlayStation, and a ring when she did not fully pay her rent or have enough food. She testified that if DHS was not in the home regularly "it would revert right back to the way it was when we came into the picture." Mather concluded that adoption was the best path for permanency for DP, that there were no impediments to adoption, and that there was a likelihood that adoptive parents could be found for DP. The CASA volunteers and DP's attorney ad litem, too, recommended adoption as the best plan to achieve permanency for DP.

Kasey partially complied with the case plan and the circuit court's orders throughout the case. Nonetheless, the circuit court found that clear and convincing evidence existed to terminate Kasey's parental rights and that it was in DP's best interest to do so. DP had been out of the home for nineteen months when Kasey's parental rights were terminated in November 2020.

II.

We review termination-of-parental-rights cases de novo. *Cheney v. Ark. Dep't of Hum. Servs.*, 2012 Ark. App. 209, 396 S.W.3d 272. But we will not reverse the circuit court's ruling unless its findings are clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, we are left with a definite and firm conviction that a mistake has been made. *Id.* In determining whether a finding is clearly erroneous, we give due deference to the opportunity of the circuit court to assess the witnesses' credibility. *Id.*

A circuit court's order that terminates parental rights must be based on clear and convincing evidence. *Dinkins v. Ark. Dep't of Hum. Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001). Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction that the allegation has been established. *Pratt v. Ark. Dep't of Hum. Servs.*, 2012 Ark. App. 399, 413 S.W.3d 261. Proof of only one statutory ground is sufficient to terminate parental rights. *Gossett v. Ark. Dep't of Hum. Servs.*, 2010 Ark. App. 240, 374 S.W.3d 205. A circuit court must find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted and (2) the potential harm,

8

specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i)–(ii) (Repl. 2020).

## A. Aggravated Circumstances

The circuit court terminated Kasey's parental rights on the failure-to-remedy ground, the subsequent-factors ground, and the aggravated-circumstances ground. Kasey challenges all the findings in the termination order. We affirm on the aggravated-circumstances ground.

Aggravated circumstances means, among other things, that a determination has been made by a judge that there is little likelihood that services to the family will result in successful reunification. Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(3)(A)–(B)(i)*. The circuit court in this case found there was little likelihood that services would result in successful reunification between Kasey and DP:

> [DP], was removed from the mother, Garakasa Hoggatt, on April 8, 2019, and has continued to be out of the custody of Garakasa Hoggatt for more than twelve months. The Department has offered services to Garakasa Hoggatt in an effort to rehabilitate her and correct the conditions that caused removal, including foster care and provisional fictive kin placement, day care services, extensive health assessment, transportation, medical services, home making services, twice weekly visitation, home visits, counseling referrals, psychological evaluations, budgeting skills, hygiene supplies, cleaning supplies, infant supplies, Healthy Families/parenting education, deposit and rent on a new apartment, and DNA testing. Garakasa Hoggatt has failed to participate in those services offered by the Department designed to remedy the circumstances that brought the juvenile into the Department's custody so that the child could be returned to her. The Court notes that the home in Maysville was one of the worst the Court had ever seen. There were rodents, cockroaches, feces on the floor, clothes everywhere, trash, rotting food, and an unclean smell to the home. From April of 2019 until December of 2019, the mother, Garakasa Hoggatt, did not want to leave the home and was very resistant to moving. The Court pleaded with her to move into another

residence because the Maysville home could not be cleaned. The Department and CASA attempted to clean the home and assist the family, but the mother laid in bed and sleep [sic] while those attempts were made to assist her. When Ms. Hoggatt finally agreed to move out of the Maysville home, the Department assisted her with deposits and rent, helped gather home goods, and helped Ms. Hoggatt and Mr. Pritchard move into a clean home. By the end of the first month, the home was already declining due to the failure to clean by Ms. Hoggatt and Mr. Pritchard. The mother was resistant to CASA and DHS assistance and slept through visits. The home became dirty and cluttered to the extent that it is a danger for a small child. Further, the refrigerator continued to be filled with open and rotting food. The Court believes that the mother probably suffers from depression, which contributed to the dirty home, but that the mother refused to work with those offering to help and refused to go to counseling to address any issues she might have, both past and present. Instead, the mother slept all day and refused to keep the home clean. Therefore, even after almost eighteen months, the circumstances that brought the juvenile into the Department's care had not been remedied even with DHS and CASA pushing and shoving and doing all they could to help her. The Court finds that the mother, Garakasa Hoggatt, has subjected the juvenile to aggravated circumstances when this Court finds that there is little likelihood that services to the family will result in successful reunification.

Kasey argues that issues like having clutter, no plug ins for electrical outlets, tobacco spit cups, and unflushed toilets do not rise to the level of neglect necessary to terminate parental rights under our caselaw. In support of her argument, Kasey cites *Morris v. Arkansas Department of Human Services*, 2019 Ark. App. 411, 586 S.W.3d 203; *Bean v. Arkansas Department of Human Services*, 2017 Ark. App. 77, 513 S.W.3d 859; *Gray v. Arkansas Department of Human Services*, 2013 Ark. App. 24; *Browning v. Arkansas Department of Human Services*, 85 Ark. App. 495, 157 S.W.3d 540 (2004); and *Dinkins v. Arkansas Department of Human Services*, 344 Ark. 207, 40 S.W.3d 286 (2001). While the environmental issues at Kasey's Bentonville apartment do not appear to be as severe as the ones described in the cases cited above, each termination case must turn on its own facts, and this case has its troublesome facts to be sure.

10

In *Bean*, 2017 Ark. App. 77, 513 S.W.3d 859, we affirmed the termination of parental rights due to aggravated circumstances, among other things, because of an unsanitary home. Although the Beans presented evidence that they had cleaned the house the day of the termination hearing, we reasoned these overtures toward participating in the case plan were an insufficient reason not to terminate rights. This court considered the entire history of the case and the services provided by DHS to the Beans as well as the fact that they had voluntarily surrendered custody of their other children to relatives. We held, "[T]he evidence before us supports the trial court's finding that there was little likelihood that continued services would remedy the Beans' circumstances and for them to sustain the improvement to an extent acceptable to foster reunification." *Id*. at 27, 513 S.W.3d at 876. Although this case is arguably distinguishable from *Bean*, the core legal principle at work remains the same: there is little likelihood that continued services would allow the parent to sustain an improvement sufficient to result in a reunification with the child given the record as a whole.

The court's decision to terminate Kasey's parental rights due to aggravated circumstances was not clearly erroneous. The evidence supports the circuit court's finding that further services were not likely to result in a successful reunification within a reasonable period of time as measured from DP's perspective and consistent with her developmental needs. In this case, DHS offered a litany of services to Kasey for a year and a half. Kasey's behavior, which impacts her ability to parent, did not improve in a meaningful way. DHS helped Kasey escape an unlivable situation in Maysville, but she was unable or unwilling to keep her "new" Bentonville apartment at a reasonable standard of cleanliness, or so the court

could reasonably conclude given the picture and testimonial evidence in the record. Importantly, Kasey refused to obey the court's order to go to counseling and had little insight into how her mental struggles affect her ability to parent. In fact, she did not show throughout the course of the case that she could be safely left alone with the young toddler. The record did not demonstrate that it was safe to allow DP to return home more than a year and a half into the case. There was evidence that Kasey had been unable or unwilling to care for the other children she had. The long history of DHS workers and CASA volunteers assisting in Kasey's home and the high level of support and services offered to Kasey are well documented.

The court was not clearly wrong in concluding that there was little likelihood that offering more services to Kasey would result in a successful reunification with DP.

## B. Best Interest

When reviewing best interest, time is viewed from the child's perspective; and the best interest of the child takes precedence at every stage of the proceedings. *Burkett v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 570, 507 S.W.3d 530. Our case law is clear that even full compliance with the case plan is not determinative; the issue is whether the parent has become a stable, safe parent able to care for his or her child. *Bailey v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 134, 572 S.W.3d 902.

Here, the circuit court found that Kasey did not demonstrate that she was a safe, stable parent who was able to care for her child. The court concluded that the "potential harm on the health and safety of [DP] is great were [DP] to be returned to the custody of the mother[.]" The decision is not clearly erroneous when the record shows that Kasey

12

failed to address her mental health through individual counseling and that she lacked the insight to see that she needed help. She could not keep her house free of trash and other hazards to a young toddler. Kasey responded to assistance with anger and apathy. Additionally, Kasey was not prepared to take custody of DP in November 2020, and there was no reasonable time frame presented of when she would be able to parent independently. DHS demonstrated that Kasey's home was largely an unsafe place for an unsupervised toddler throughout the long course of this case. A child's need for permanency and stability may override the parent's need for additional time to improve the parent's circumstances. Such is the case here.

## III.

The circuit found by clear and convincing evidence that it was in the best interest of DP to terminate Kasey's parental rights. It concluded that Kasey had not demonstrated the ability to protect DP and keep her safe from harm, that the potential of harm was too great to return custody to her, that aggravated circumstances existed, and that it was in DP's best interest to have a safe and permanent home. This decision was not clearly erroneous given the record before us.

Affirmed.

GRUBER and MURPHY, JJ., agree.

*Dusti Standridge*, for appellant.

*Ellen K. Howard*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor child.