
# ARKANSAS COURT OF APPEALS
DIVISION III
**No.** CV–16–674

CHRIS BEAN AND JENNIFER BEAN
APPELLANTS

V.

ARKANSAS DEPARTMENT OF HUMAN
SERVICES AND MINOR CHILDREN
APPELLEES

**OPINION DELIVERED:** FEBRUARY 8, 2017

APPEAL FROM THE BENTON
COUNTY CIRCUIT COURT
[NO. 04JV-15-500]

HONORABLE THOMAS E. SMITH,
JUDGE

AFFIRMED

## ROBERT J. GLADWIN, Judge

Appellants Chris and Jennifer Bean appeal the May 2, 2016 order of the Benton County Circuit Court terminating their parental rights to their four minor sons, C.B. 1, C.B. 2, C.B. 3, and C.B. 4, then ages five years, four years, three years, and eleven months. They argue that the trial court erred in the permanency-planning hearing for C.B. 1, C.B. 2, and C.B. 3 by changing the goal of the case to adoption without sufficient evidence to meet the statutory criteria to change the goal. They also argue that the evidence does not support the statutory grounds that the trial court relied on to terminate their parental rights and that the evidence does not demonstrate any potential harm in returning the children to their custody. We affirm.

I. *Facts*

This case began on July 22, 2014, when the Arkansas Department of Human Services (ADHS) filed a petition for emergency custody and dependency-neglect in regard to the Beans' three sons, C.B. 1, C.B. 2, and C.B. 3. ADHS had been monitoring the family for environmental neglect since December 2013. The family had moved from a trailer into a three-story duplex, but ADHS took an emergency hold on the three boys after an investigator discovered that the family had an extensive history with ADHS for environmental neglect on six previous children who were in the custody of their maternal grandmother because the Beans voluntarily signed over guardianship upon learning that ADHS had been contacted about their circumstances.

The three boys were adjudicated dependent-neglected on September 16, 2014. Six months into the case, ADHS determined that the Beans were not in compliance with the case plan and attempted to seek termination of parental rights (TPR) on the basis that there was little likelihood that the Beans would reach full compliance. The Beans challenged ADHS's recommendation, and the trial court found that the Beans had complied with multiple aspects of the case plan, including participation in parenting classes, psychological evaluations, couples' counseling, individual counseling, and visitation, but that they had not maintained a "clean" home during the review period. Even though the case had been open for only six months, and the Beans were in partial compliance with the case plan, the trial court set the case for a March 2015 TPR hearing.

The March 2015 TPR hearing was subsequently changed to a review hearing by agreement of the parties; after that hearing, the trial court entered an order finding that the

Beans had "fully complied with the case plan and court orders." Although the primary issue was environmental neglect, which was found to be remedied at the time of that hearing, the trial court did not return the boys to the Beans; rather it ordered the Beans to develop and provide a plan for the care of the boys to ensure that their therapies would continue when they returned home. The case was set for a permanency-planning hearing on June 16, 2015.

At the June 16, 2015 permanency-planning hearing, ADHS submitted a court report and photographs from the previous six months. The court report indicated that the Beans were complying with the case plan, yet ADHS continued to recommend TPR and adoption. At the beginning of the hearing the trial court noted that the case was an environmental one and that at the prior hearing it was close to placing the boys back with the Beans. It asked to hear from ADHS why there had been another sudden shift in ADHS's goal. At the conclusion of the hearing, the trial court found that the Beans had no stable employment and that the home had not been kept "clean enough" for the trial court to find that the Beans had resolved the environmental issues. In its permanency-planning order filed on July 1, 2015, the trial court changed the goal to adoption but kept a secondary concurrent goal of reunification and ordered ADHS to continue offering services, including Intensive Family Services (IFS) in the home. The Beans sought to appeal the order at the time it was entered by requesting a Rule 54(b) certificate for an interlocutory appeal, but that was denied.[1]

---

[1]Pursuant to Arkansas Supreme Court Rule 6-9(a)(1)(B) (2016), permanency-planning orders are appealable only if the trial court enters an order in compliance with Arkansas Rule of Civil Procedure 54(b) (2016). The Beans' request for a certificate was

Just before the permanency-planning hearing, on May 19, 2015, the Beans had another child, C.B. 4, who was left in the Beans' custody. Ms. Bean lied to both caseworkers and to the trial court about being pregnant again until her eighth month of pregnancy. Three months after C.B. 4 was born, ADHS filed a petition for dependency-neglect, not seeking custody of C.B. 4 but to have C.B. 4 adjudicated dependent-neglected and added to the already-open case.[2] C.B. 4's inclusion in the case took place *after* the permanency-planning hearing, and shortly thereafter, on September 22, 2015, ADHS filed a combined petition for TPR and a motion for no reunification services on all four of the boys. A TPR hearing was set for October 20, 2015.

A few days before the scheduled TPR hearing, on October 12, 2015, for reasons that are unclear, the three older boys were sent home on a trial home placement where C.B. 4 remained in the Beans' custody. At the October 20, 2015 hearing, the trial court converted the hearing to another review hearing and found that the Beans were in partial compliance with the case plan and that they were partially moving toward resolving the health-and-safety issues that had caused the removal of the three older boys. Although the resulting order did not reference the trial home placement that the three boys had been on for the previous week, the order did reflect a long list of requirements for the Beans to follow. On

denied, and they appealed; but the appeal was dismissed without prejudice because, as this court held, the order denying the certification did not dismiss the parties or conclude their rights, and the appeal did not fall under any exception to Arkansas Rule of Appellate Procedure–Civil 2(a) (2016) because the permanency-planning order could be taken up at the conclusion of the case. *See Bean v. Ark. Dep't of Human Servs.*, 2016 Ark. App 58. That is the procedure the Beans chose to follow, and the permanency-planning order, along with the TPR order, are the subjects of this appeal.

[2]The adjudication order related to C.B. 4 was entered on November 23, 2015.

SLIP OPINION

that same date, the trial court adjudicated C.B. 4 dependent-neglected based on neglect and parental unfitness, finding that he was at substantial risk of inadequate supervision and not having his mental, physical, and emotional needs met. Although the trial court noted that the goal was reunification, C.B. 4 had not been removed from the custody of the Beans as of that time.[3]

On December 15, 2015, at the end of the sixty-day trial home visit, the visit was extended for an additional forty-five days. However, on January 11, 2016, ADHS terminated the extended visit and removed all of the boys, including C.B. 4. During the emergency hold of C.B. 4, but before ADHS could file the formal emergency petition, the Beans filed a motion for emergency hearing stating that ADHS had made known its desire to remove the children at the time the trial visit was extended on December 15, 2015, that the Beans had been in compliance with every requirement placed on them by the court and ADHS, and that ADHS's removal of the children was opportunistic because it took advantage of the difficult situation the Beans were in–Mr. Bean had been hospitalized and their basement had flooded during a storm. The Beans requested the emergency hearing so that they could be heard on the removal of all of the boys, and the trial court set the hearing on the motion four days later. ADHS filed its formal motion for ex parte emergency change of custody on January 14, 2016, stating that the home had fallen into such disarray that the conditions posed a health-and-safety risk to the children.

---

[3]The Beans appealed the adjudication of C.B. 4, but this court affirmed on June 22, 2016, three months after the trial court had already terminated the Beans' parental rights to all of the boys. *See Bean v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 350, 498 S.W.3d 315.

After a hearing, the trial court entered an order of emergency change of custody on C.B. 4 and a subsequent probable-cause order finding that the Beans had ultimately failed to follow the trial court's orders during the trial home placement and that their actions had put the children at substantial risk of harm. ADHS then refiled its petition for TPR on February 19, 2016, and the TPR hearing was held on March 4. Because of the highly contested nature of the entire case, the parties asked the court to incorporate into the record all prior testimony from all prior hearings, as well as exhibits from those hearings, and the trial court agreed. On May 2, 2016, the trial court entered an order terminating the Beans' parental rights to all four children. The Beans filed a notice of appeal of the May 2, 2016 TPR order, as well as the July 1, 2015 permanency-planning order, which could be taken up as an interim order with the final and appealable TPR order. *See* Ark. Sup. Ct. R. 6-9(a)(1)(C); *Bryant v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 390, 383 S.W.3d 901; *Velazquez v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 168.

## II.  *Permanency-planning Hearing Change of Goal*

The burden of proof in permanency-planning proceedings is by a preponderance of the evidence. Ark. Code Ann. § 9–27–325(h)(2)(B) (Repl. 2015). The standard of review on appeal is de novo, and we will reverse only if the trial court's findings are clearly erroneous. *Ark. Dep't of Human Servs. v. McDonald*, 80 Ark. App. 104, 91 S.W.3d 536 (2002).

Arkansas Code Annotated section 9–27–338(a)(1) states that a "permanency planning hearing shall be held to finalize a permanency plan for the juvenile." Subsection (c) states,

(c) At the permanency planning hearing, based upon the facts of the case, the circuit court shall enter one (1) of the following permanency goals, listed in order of preference, in accordance with the best interest, health, and safety of the juvenile:

(1) Placing custody of the juvenile with a fit parent at the permanency planning hearing;

(2) Returning the juvenile to the guardian or custodian from whom the juvenile was initially removed at the permanency planning hearing;

(3) Authorizing a plan to place custody of the juvenile with a parent, guardian, or custodian only if the court finds that:

(A)(i) The parent, guardian, or custodian is complying with the established case plan and orders of the court, making significant measurable progress toward achieving the goals established in the case plan and diligently working toward reunification or placement in the home of the parent, guardian, or custodian.

(ii) A parent's, guardian's, or custodian's resumption of contact or overtures toward participating in the case plan or following the orders of the court in the months or weeks immediately preceding the permanency planning hearing are insufficient grounds for authorizing a plan to return or be placed in the home as the permanency plan.

(iii) The burden is on the parent, guardian, or custodian to demonstrate genuine, sustainable investment in completing the requirements of the case plan and following the orders of the court in order to authorize a plan to return or be placed in the home as the permanency goal; and

(B)(i) The parent, guardian, or custodian is making significant and measurable progress toward remedying the conditions that:

(a) Caused the juvenile's removal and the juvenile's continued removal from the home; or

(b) Prohibit placement of the juvenile in the home of a parent.

(ii) Placement of the juvenile in the home of the parent, guardian, or custodian shall occur within a time frame consistent with the juvenile's developmental needs but no later than three (3) months from the date of the permanency planning hearing;

(4) Authorizing a plan for adoption with the department filing a petition for termination of parental rights . . . . [Exceptions not applicable.]

The Beans claim that the evidence presented at the permanency-planning hearing demonstrated that they had made substantial and sustained progress on the case plan and trial court orders toward having the three older children returned to their custody. The trial-court, however, changed the goal to adoption—with a concurrent goal of reunification—finding that the Beans had only partially complied with the case plan. The trial court found

that neither of the Beans had stable employment, which caused concern about their ability to maintain the home financially, and that the house had "not been kept clean enough to say the environmental neglect is resolved."

The Beans note that some type of placement with a parent, even if it cannot be immediate, constitutes the top three preferred goals of the permanency-planning statute. Pursuant to changes in the statutory scheme in 2009 and again in 2013, parents were provided with greater protection and preference, and implementing an adoption plan falls into the fourth position.

The order that resulted from the March 2015 review hearing that took place three months prior to the permanency-planning hearing indicated that the Beans had "fully complied with the case plan and court orders." ADHS's exhibit 1, which is the permanency-planning court report filed by caseworker Selah Meyer, indicated that the Beans remained in compliance with the case plan at the time of the permanency-planning hearing. Meyer wrote that "the parents have worked hard complying with the Department." The testimony from Meyer at the permanency-planning hearing regarding the condition of the home was consistent with the report, and multiple photographs were also admitted. Nonetheless, Meyer testified that the home presented health-and-safety hazards sufficient that she did not believe the children could return home that day, *or* in three months. The Beans claim that the record does not support what ADHS attempted to demonstrate and what the trial court found in regard to the environment of the home.

Katherine Krueger, a case manager and stabilization coordinator for Seven Hills,[4] testified that she had been working with the Beans since February 2015—or five months. Krueger interacted with the Beans personally and visited their home at least once a week, and she stated that during her visits, there had "not been any signs of environmental neglect, or it being overly messy." She also noted that she had not received any complaints from neighbors about the state of the house.

Likewise, the Beans' neighbor, Patty O' Bannon, testified that she had been to the Beans' home about seven times, with the last time being the morning of the hearing. She stated that it had never "appeared to be unusually messy or dirty." She described a few dishes in the sink sometimes, a few baskets of clothes in the closet, and the bed not being made. She believed the house to "always look livable."

Finally, the Beans point out that C.B. 4 was born during the period that ADHS asserted that the home was a total health–and–safety hazard—yet, C.B. 4 was allowed to remain home. If the home's environment presented such health–and–safety hazards that total severance of the parent-child relationship was warranted, those hazards would exist for all of the children.

The Beans acknowledge that they had clutter but claim it was not the type of clutter that posed any type of health–and–safety hazard, and it was certainly not the type to warrant an action as serious and grave as the lifelong separation of a parent from a child. They urge

---

[4]Seven Hills is an organization to which the Beans were referred by ADHS for housing assistance, including casework management related to maintaining a home.

that the trial court's finding that the environmental neglect had not been remedied was clearly erroneous and that the evidence, including the photographs, is indisputable.

The Beans also argue that they demonstrated that their finances were sufficient to maintain the household and that they were able and willing to work beyond a full-time position to make ends meet for their children. Meyer testified that Mr. Bean, who carried the responsibility of the family income, was financially unstable and would not be able to pay the rent after the rent assistance from Seven Hills terminated. However, on cross-examination, Meyer acknowledged that her comment was an assumption based on another assumption that Mr. Bean was performing only odd jobs for a living.

O'Bannon testified that she hired Mr. Bean to help around her home and that he had worked nearly every day for her since March, when she first hired him. She stated that her records indicate that she had paid him a significant amount during that time period, and she offered to be a continuing resource for the Beans if they needed it. Krueger, the Seven Hills case manager, acknowledged that Mr. Bean worked many odd jobs.

Mr. Bean testified that he still had full-time employment with Walmart—and he was not just working odd jobs—but that he had been on paternity leave since the birth of C.B. 4 on May 19, 2015, and had extended his return date by two weeks for therapy on his back. He testified that he made $13.15 per hour at Walmart and had made $3000 in the two months he was on leave doing odd jobs. Mr. Bean, working odd jobs during his time off, made more money working those odd jobs during that time period than he would have made at Walmart. He said he had no plans to quit his job at Walmart and that he would be returning to work the Tuesday after the hearing; however, Mr. Bean provided no proof at

the permanency-planning hearing that he was in fact scheduled to return to work at Walmart.

The Beans provided evidence that they wrote out a daily schedule, provided a list of emergency contacts, committed to keeping the children in therapy and daycare at Kids for The Future therapy center, and had also obtained packets to have one or more of the children evaluated for autism at the Schmeiding Center. Mr. Bean also testified that they were willing to accept casework management through Seven Hills even after they were no longer obligated because they were receiving cash assistance from it.

At the conclusion of the hearing, the trial court made an oral finding that Mr. Bean did not have employment suitable for long-term stability and that the home was not sufficiently clean for it to find that the environmental-neglect issue had been rectified. The trial court also noted that "positives" were taking place and further commented that the home was not a total health-and-safety issue; but that given the Beans' past and the condition that the home was in when the kids were removed, the trial court wanted the house to be "everyday, spotless." The trial court indicated that it was not "convinced" that TPR was appropriate at that time and found that there should be a concurrent goal of adoption *and* reunification, with ADHS starting IFS in the home, while still setting the case for TPR. The parties argued as to whether reunification could exist as a concurrent goal or had to be a secondary goal, and the trial court clarified that the goal would be concurrent because ADHS had not brought the case to a place where the trial court would be convinced that TPR was appropriate if asked to terminate that day.

The Beans claim this evidence demonstrates that there was insufficient evidence to go forward on TPR; accordingly, it was improper for the trial court to authorize a primary plan of adoption. The Beans acknowledge that the burden shifted to them under section 9–27–338(c)(3)(A)(iii) to demonstrate genuine, sustainable investment in completing the requirements of the case plan and following the orders of the trial court, but they urge that the hearing evidence demonstrated that they met that burden. The Beans argue that they made significant and measureable progress from where the case started and that the home had been free of health-and-safety hazards for an extended period of time. They submit that a mistake was made when the trial court found that adoption was an appropriate permanency-placement plan and that the permanency-planning order should thus be reversed.

We find no merit to the Beans' challenge to the intermediate permanency-planning order. First, neither the permanency-planning statute, section 9–27–338(b)(1)(A), nor *Phillips v. Arkansas Department of Human Services*, 85 Ark. App. 450, 158 S.W.3d 691 (2004),[5] support the Beans' argument. In its July 1, 2015 permanency-planning order, the trial court listed the permanency goal of the case as adoption with services to continue until the TPR hearing, with a secondary concurrent goal of reunification also listed. Despite the trial court's finding concurrent goals of adoption and reunification at the June 16, 2015 permanency-planning hearing, TPR and adoption were not the goals implemented immediately thereafter by the trial court.

_____

[5]*Phillips*, *supra*, analyzes the "timing" of a permanency-planning hearing when an order for no reunification of services has been entered rather than "whether" the statute requires a hearing to be held regardless and the penalty for failure to do so.

SLIP OPINION

Although ADHS filed a combined petition for TPR and a motion for no reunification of services on all four of the boys on September 22, 2015, just days prior to the scheduled TPR hearing, on or about October 12, 2015, for reasons that are unclear, the three older boys were sent home on a trial home placement where C.B. 4 was still in the Beans' custody. The October 20, 2015 TPR hearing was converted to another review hearing, and on December 15, 2015, at the end of the sixty-day trial home visit, the visit was extended for an additional forty-five days. It was the subsequent action, or inaction, by the Beans that prompted ADHS to terminate the extended visit on January 11, 2016, remove all the boys, and refile a TPR petition on February 19, 2016. Accordingly, because the Beans were provided an opportunity to reunify with the children through the subsequent trial home placement, we hold they were not harmed by the change in case goal to include concurrent goals of adoption and reunification at the time of the permanency-planning hearing.

III. *Termination as to C.B. 4 in Light of No Permanency-planning Hearing*

The Beans also challenge the trial court's terminating their parental rights with respect to C.B. 4 in light of its failure to hold a permanency-planning hearing with respect to C.B. 4. We find no merit in this argument. The permanency-planning statute specifically states that "nothing in this section shall be construed to prevent the [ADHS] or the attorney ad litem from filing at any time prior to the permanency planning hearing a . . . petition to terminate parental rights." Ark. Code Ann. § 9-27-338(b)(1)(A) The termination statute, section 9-27-341, provides that a permanency-planning hearing is not a prerequisite to the filing of a TPR petition or to the trial court's consideration of a TPR petition. The only

requirement is an appropriate permanency plan, which the trial court had in this case. In a recent case, the trial court held the adjudication hearing and the TPR hearing together. *See Burkett v. Ark. Dep't Human Servs.*, 2016 Ark. App. 570, __ S.W.3d __. A petition to terminate parental rights, therefore, is not contingent on the outcome of a permanency-planning hearing and constitutes a freestanding proceeding pursuant to section 9-27-341.

Although section 9-27-341(b)(1)(A) states that "the circuit court may consider a petition to terminate parental rights if the court finds that there is an appropriate permanency-placement plan for the juvenile," the statute does not require that this finding be made specifically at a permanency-planning hearing. In a review order entered subsequent to the permanency-planning hearing for C.B. 1, C.B. 2, and C.B. 3, and subsequent to the adjudication of C.B. 4 as dependent-neglected, the trial court found that, as to all four children, "DHS has made reasonable efforts to finalize a permanency plan." And in the TPR order for all four children, the trial court found that "[ADHS] made reasonable efforts to finalize the permanent placement for the juveniles and the juveniles cannot or should not be returned to the home of the parents." In order to terminate parental rights, ADHS must only be "attempting to clear a juvenile for permanent placement." Ark. Code Ann. § 9-27-341(a)(B)(2). ADHS had an appropriate permanency plan for the children at the time of TPR—adoption—and adoptability is not challenged in this appeal. We hold that there was no legal infirmity, therefore, with the trial court's hearing on ADHS's TPR petition, regardless of what happened or did not happen at the previous permanency-planning hearing.

IV. *Challenges to Substantive Findings Underlying TPR Order*

Cases involving TPR are reviewed de novo on appeal. *Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001). The appellate court will not reverse the trial court's decision unless the court's finding of clear and convincing evidence is clearly erroneous. *Yarborough v. Ark. Dep't of Human Servs.*, 96 Ark. App. 247, 240 S.W.3d 626 (2006). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Gregg v. Ark. Dep't of Human Servs.*, 58 Ark. App. 337, 952 S.W.2d 183 (1997).

Evidentiary decisions, such as those involved in determining whether statutory grounds for TPR have been met, involve the trial court's duty to judge the witnesses' credibility. Appellate courts give due deference to the circuit court in these matters. *Chastain v. Chastain*, 2012 Ark. App. 73, 388 S.W.3d 495. This deference is even greater in cases, like this one, that involve child custody, as a heavier burden is placed on the judge to utilize to the fullest extent his or her powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. *Thomas v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 309, 419 S.W.3d 734. The credibility of any witness's testimony is to be assessed by the trier of fact, and the trier of fact may believe all, part, or none of it. *See Brumley v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 90, 455 S.W.3d 347.

The TPR analysis is twofold: it requires the trial court to find that TPR is in the best interest of the children and that the parents are unfit under one of the nine enumerated statutory grounds. Ark. Code Ann. § 9-27-341(b)(3)(A)−(B). First, "best interest" includes

consideration of the likelihood that the children will be adopted and the potential harm caused by returning custody of the children to the parent. Second, "unfitness" requires the court to find sufficient evidence supporting one of the nine grounds. *Id.* After a two-day hearing, the trial court found that TPR was in all of the boys' best interest in that they would likely find permanency through adoption and would be subject to potential harm if returned to the Beans' custody. The trial court further found the three grounds of unfitness pled against the Beans. The Beans do not challenge the trial court's finding regarding adoptability but do challenge the findings regarding potential harm and the statutory grounds for TPR.

### A. Twelve-Months-Out-of-Custody, Failure-to-Remedy Ground

Found at section 9-27-341(b)(3)(B)*(i)(a)*, this ground allows for TPR if it is in the child's best interest, and the child has

> been adjudicated by the court to be dependent-neglected and has continued to be out of the custody of the parent for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent.

*See also Brabon v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 2, 388 S.W.3d 69. There are three conditions to this statute: (1) that the child has been adjudicated dependent-neglected, (2) that the child has continued out of the custody of the parent for twelve months, and (3) that the parent failed to remedy the conditions causing removal despite a meaningful effort by ADHS to correct those conditions.

The trial court found that this ground applied to the three eldest boys because of the temporal requirement that the children be out of the home for twelve months, which C.B.

4 did not meet. The Beans concede the first two conditions but challenge the trial court's finding that they failed to remedy the conditions causing removal.

As noted in the TPR order, the issue causing removal, and on which the children were adjudicated dependent-neglected, was environmental neglect. In regard to this ground, the trial court specifically found that the "parents have failed to correct the environmental neglect that initially caused the removal of the juveniles." They claim that the record does not support such a finding.

We disagree. One of "conditions that caused removal" in the case of the three oldest children was, among other things, severe environmental neglect. On December 20, 2013, ADHS investigator Shannalin Robertson visited the Beans' home on a referral and described the "filthy and unsafe" condition of the Beans' trailer. A protective-services case was opened on the Beans on February 12, 2014, and assigned to caseworker Selah Meyer. Between February and July 2014, ADHS workers Meyer and Calla Taylor made multiple visits to the home, but the Beans had not remedied the filthy conditions. On July 19, 2014, Meyer was not allowed entrance into the house for a home visit, but she could observe similar conditions through the doorway. ADHS took an emergency hold on the three children that same day based on environmental neglect, inadequate supervision, and medical neglect. The trial court subsequently adjudicated them dependent-neglected on September 16, 2014, for reasons of environmental neglect.

At a review hearing held on October 20, 2015, pertaining to all four children, the trial court found that the Beans were in partial compliance with the case plan. The trial court decided to allow C.B. 4 to remain in the Beans' care and to allow a trial home

placement on the other three boys, with concurrent IFS. The trial court issued the following

warning regarding the Beans' need to demonstrate that they could properly care for the four

children and maintain a clean and safe home:

> Mr. and Mrs. Bean, we're now to the all or nothing roll of the dice. You're either going to prove me right, that our services have worked, or you're going to prove everybody else right . . . that we won't be able to—even though we don't have the evidence, our guts are worried about the fact that you could raise all four of these kids . . . . I'm giving you a chance. Because in my gut I have concerns but I want to make sure I have the facts to back up my gut. And you're either going to do this or you're not . . . .

The trial court also detailed specific instructions for the Beans regarding the upkeep of their

home and safety concerns for the four children, which included expectations of meeting the

children's special needs.

Two months later, on January 14, 2016, ADHS filed an ex parte motion for

emergency change of custody on C.B. 4 and removed all four children because the trial

home placement had failed. Meyer detailed in her affidavit that CASA worker Dianna Hearn

had visited the home on January 4, 2016, and reported serious concerns with the

environmental conditions of the home. There was "trash, food and dirt, dirty clothes on the

floors, clean clothes on the couch, vomit on the floors that had not been cleaned for several

days, trash can[s] overflowing, the children wearing dirty clothes, the floor was stained with

several days old spills and had not been cleaned in some time." Meyer received a hotline

call on January 8, 2016, alleging that "the environment has a high severity of trash and dirty

underwear everywhere . . . dirty pull ups on the floor. There is vomit on the floor from a

week ago . . . . There is old food sitting on the floor and trash bags on the porch." The

trash can was also allegedly "overflowing," and there was no room to throw dirty diapers

away. The hotline caller alleged that the basement had flooded two weeks ago, and there were soaked foam mats, mold, and children's toys in the basement. The hotline caller also alleged that there was an unattended space heater in the basement bathroom being used to "dry up the water."

Meyer visited the home the same night the hotline call was received and reported that it was found to be "worse than what the report stated." She explained that, among other things, C.B. 4 was crawling on a dirty floor in the living room unattended, and two other children were sitting in high chairs and one had a dirty face. The Beans' room "was a disaster." The children's rooms "had piles of clothes in the closets and there was trash on the wooden floor. The beds did not have sheets on them." Meyer observed trash, toys, and clothes throughout the house, including on the stairs and the living room floor; however, she did not find any signs of flooding in the basement.

Despite these observations, Meyer allowed the Beans several days to remedy the environmental hazards in the home. But on January 11, 2016, supervisor Stormy Randolph visited the Beans' home and observed it to "be in worse condition" and that the front door was "blocked by items." Meyer also noted concerns with C.B. 4's health, stating "failure to thrive [was] still in play." She concluded that all of the children's health and safety were in danger due to environmental neglect, inadequate supervision, medical neglect, and failure to thrive, and she removed the children from the home. The trial court subsequently found probable cause existed to remove C.B. 4 to ADHS custody and to terminate the trial home placement on the other three children, and it made the following specific findings, among others, in its February 1, 2016 probable-cause order, among others:

• The trial home placement started with an order that was very specific for how the home should be maintained and how the parents should conduct themselves;

• The trial court gave the parents a chance to show they could handle the children at home over the objections of ADHS, CASA, and the attorney ad litem;

• The trial court is troubled by the fact that the parents have been surrounded by service providers, ADHS, and CASA but they failed to ask for help when confronted with changing circumstances;

• The parents do not acknowledge the trouble in the home;

• The parents had numerous warnings to clean the home before ADHS finally removed the children;

• The parents were not upfront with ADHS and CASA about their circumstances despite the trial court ordering them to provide full access and for them not to keep secrets and not to lie about their circumstances;

• Mr. Bean did not maintain income and employment stability as ordered by the trial court;

• Clothing and bedding instructions were not followed;

• The photographs of the home over a substantial period of time show a home that is completely unacceptable; and

• The parents demonstrated that they are not able to meet the special needs of the children.

ADHS filed an amended TPR petition for all four children on February 19, 2016, and the trial court held a TPR hearing for all four children on March 3, 2016. At the hearing, the trial court received the following evidence relevant to the Beans' failure to remedy the environmental-neglect issues and the little likelihood of successful reunification.

CASA volunteer Dianna Hearn testified that she had visited the children twenty-six times during the case, but had not been able to access and observe the home because the Beans did not answer the door and had "not indicated to me, in any way, a willingness to continue to cooperate with CASA." Hearn also testified that Mr. Bean was vague with her about his employment situation and she could not verify whether he had stable employment. She discussed how the children had been thriving outside the home in ADHS custody, but she had "seen a lot of changes in the boys" during the period of the trial home placement. She stated that she was concerned for the children's well-being because there had been no

change in how the Beans parented since 2014. She also expressed concern about the Beans' financial stability. She stated that she had "not seen a lot of what the Beans have learned be applied. I know it has been tough on them and they have attempted to do what they have been asked."

Meyer stated that she had been the ADHS caseworker since the children had come into care in 2014 and also for the earlier protective-service case. She summarized the history of the case and testified that she had "gone through their home and pointed out safety hazards for them. I explained to them their expectations for what a safe home looks like, several times." She listed the multiple services ADHS had provided the Beans throughout the case, including parenting classes, medical, speech, occupational and physical therapy for the children, individual and family counseling, clothing, visitation, transportation, and medical- and mental-health evaluations. She explained that she also made referrals for them to get furniture and appliances and noted that the family had been through IFS programs twice. ADHS had helped the family with rent payments and with finding sources of assistance to pay their bills. Meyer testified,

> When the case in court opened, I was concerned about the state of their home . . . those concerns are not resolved . . . . [the Beans] have been trained a lot, already. We have offered every services there are. Parenting classes. They've had so many parenting classes and they seem to be stubborn of their old ways. And they can change for a little while, but when nobody is watching, they are back to what they believe . . . how it should be done . . . . So the[y] learned some things . . . but they don't want to do what they're told to do.

She explained that "they've not demonstrated an intention to keep their home in a different way than in the beginning of this case. Only when people are watching them or telling them I'm coming to see you . . . . If you surprise them, it's most likely you'll find a messy

SLIP OPINION

house." Meyer concluded that "[w]e're probably close to a year and a half now . . . . There aren't any other services that you can think of that are going to make a huge difference in where we are today. I feel like we're at a place where there's little likelihood of me being able to see reunification." Ms. Meyer also testified that the Beans had had cases with ADHS since 2002 and had received parenting classes during five prior cases. The trial court found Meyer's testimony to be credible.

IFS therapist Keri Timmons explained that even though flooding would put a stress on any family, "even with the quote/unquote flooding and being sick, the services that I had provided, that home should not have been in that condition. The problem isn't when someone is in the home helping them. It's when no one is there watching . . . ."

Ms. Bean acknowledged that the numerous photographs in the record "reflect the state of my house since the kids came back into care." She claimed that "[g]oing forward, if the kids were returned to our home, we would be able to keep that house clean." But Ms. Bean also testified that their lease was not going to be renewed and that they were currently looking for a home. She admitted that she had not notified ADHS of this sudden change of circumstances before the TPR hearing. She admitted that "on and off through this case we've had trouble keeping the house," and admitted that ADHS had been involved with the family since 2002 and there had been "repeated problems" with environmental neglect. She repeated that they had to move at the end of the month and that they did not have a place to move to at the time of the TPR hearing but claimed they had the money to move. She claimed that she did not want "help from others" and thus did not accept WIC subsidies, despite acknowledging she willingly accepted ADHS's rental-assistance

payments. She also acknowledged that her parents voluntarily had been given custody and guardianship of the parties' six other children in 2009 to avoid ADHS troubles.

Mr. Bean confirmed that their lease would not be renewed at the end of the month. He claimed that he had "a plan for moving out and finding a new place" but then stated, "I'm leaving it up to Ms. Bean to find us a place." He acknowledged that he had been fired from his job at Walmart but claimed he had been "approved to go back" and was working odd jobs at the time. He noted that he could not obtain loan funds for a new house because he had "filed for bankruptcy three years ago." He admitted that they had not kept the house clean the entire case.

At the conclusion of the hearing, the trial court found, that "while there will be volumes sent up to the next level [on appeal],[6] this case is very simple . . . . It started because of environmental neglect." The trial court stated, "[T]he proof is directly in the January pictures. This Court pulled these kids because this house environment, after all of the services, after all this time, after all of the eyes, was unacceptable." We agree that the pictures

---

[6]We note that the Beans' counsel argues that the primary evidence to support their position comes from the documents and the multitude of photographs admitted throughout the course of this case. Despite making this argument, the Beans' counsel abstracted 835 pages in this appeal. Rule 4–2(a)(5) of the Rules of the Arkansas Supreme Court and Court of Appeals provides that the appellant's abstract should consist of an impartial condensation "of the material parts of all the transcripts in the record . . . . Information in a transcript is 'material' if the information is essential for the appellate court to confirm its jurisdiction, to understand the case, and to decide the issues on appeal." The 835-page abstract in this case is egregious, at best, with its only redeeming quality being to enlighten us regarding the conflicting evidence provided by the witnesses during the permanency-planning hearing and the TPR hearing. While this is instructive in light of counsel's attempt to cherry pick only a handful of statements made by witnesses, counsel, and the trial court to bolster the Beans' argument, we remind counsel that overabstracting testimony can run afoul of Rule 4–2 just as underabstracting can violate the rule.

from ADHS's January 2016 visits depict a house in an unacceptable state of clutter and uncleanliness for four small children, especially for a family currently participating in IFS. The trial court characterized one picture in particular, showing baby C.B. 4 lying next to several bags of trash, as "unacceptable" for a trial home placement and "no excuse, no flood, no illness should've allowed this house to be in this condition." The trial court stated that "what is most alarming to this Court, after 14 months of working with the Department this time . . . no help was asked for." Although the trial court agreed that photos taken the day of the TPR hearing showed the house in a cleaner and more acceptable state, it was still concerned whether it would remain that way once court supervision was removed. The trial court thus concluded there was little likelihood that "these issues can be resolved safely for these kids." The trial court also found that as for C.B. 1, C.B. 2, and C.B. 3, the Beans had not remedied the recurring environmental-neglect issues that caused the initial opening of the case.

All of the above evidence in the record supports the "failure to remedy" statutory grounds with respect to C.B. 1, C.B. 2, and C.B. 3. De novo review shows no grounds for a "firm conviction" that the trial court made a mistake in finding the Beans failed to remedy the conditions that had caused the three oldest children's removal. Despite the Beans' completion of some services and partial compliance with the case plan, the trial court was concerned that after fourteen months of services the Beans still had not reached a point where they could safely parent and protect their children. Even full compliance with the case plan is not a bar to TPR; the issue is whether the parent has become a stable, safe parent able to care for his or her children. *Villasaldo v. Ark. Dep't of Human Servs.*, 2014 Ark. App.

465, 441 S.W.3d 62. The Beans' partial compliance with a case plan does not justify reversal of TPR case when the Beans continued to make decisions adverse to the children, i.e., letting the environmental-neglect issues reoccur throughout the case despite knowing it was a major area of concern to the trial court and to ADHS.

As is plain from the statutory language, ADHS must show in a TPR proceeding that the parent failed to correct the *conditions that caused removal*. The Beans failed to demonstrate that they could maintain their home in the manner necessary to protect the children's health and safety. The trial court's finding that, in the case of C.B. 1, C.B. 2, and C.B. 3, the parents had failed to correct the environmental neglect that initially caused the removal is supported by clear and convincing evidence—especially evidence concerning the failed trial home placement and subsequent removal of all four children for recurring environmental neglect. Meyer's testimony as to the IFS provided to the Beans for fourteen months, the involvement of CASA, and the rental and other material assistance that ADHS provided to the Beans also support a finding that the Beans' failure to remedy the environmental-neglect issues that caused the case to open for the three oldest children was despite a meaningful effort on ADHS' part to provide reunification services. Despite fourteen months to demonstrate to ADHS that they had resolved their environmental-neglect issues, the failed trial home placement, the disregard of multiple warnings received throughout the case regarding the condition of the home and the health of the children, as well as their hesitation to cooperate with ADHS or ask for help when needed and surrounded by various service providers, demonstrate the Beans' inability and indifference to remedying the conditions that caused removal.

We hold that the evidence sufficiently supports this basis for TPR for the three oldest children; accordingly, the trial court's decision to terminate the Beans' parental rights on the failure-to-remedy ground was not clearly erroneous.

B.  Aggravated-circumstances Ground—Little Likelihood of Reunification

The "aggravated circumstances" ground at Arkansas Code Annotated section 9-27-341(b)(3)(B)(ix)*(a)(3)(A)*, allows for TPR of parental rights if TPR is in the children's best interest, and "the parent is found by a court of competent jurisdiction . . . to [h]ave subjected any juvenile to aggravated circumstances." Aggravated circumstances can mean many things, but in this case, the trial court found that aggravated circumstances existed with respect to all four children because "there is little likelihood that services to the family will result in successful reunification." Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(3)(B)(i)*.

In the TPR order, the trial court noted that the Beans have had ten children—six of whom were already in the custody and under the guardianship of a relative when the case began, and that they had a history of problems with supervision and environmental neglect that spanned from 2002. The trial court found that the Beans have had on-going sporadic contact with ADHS since then, and that in this case, despite repeated orders from the trial court, the Beans failed to maintain their home despite the offer of services by ADHS. The trial court found that the Beans have failed to follow its orders regarding the state of cleanliness expected, and that there was little likelihood that further services would result in successful reunification.

The Beans challenge this finding in light of the evidence discussed previously. We disagree and hold that the evidence clearly supports the trial court's finding, applicable to all

four children, that there was little likelihood that future services would result in successful reunification. Caseworker Meyer, whom the trial court specifically found to be a credible witness, testified about the numerous services provided throughout the case. Despite these services, the Beans at no point showed they could *consistently maintain* a sanitary and safe household for four small children.

Although the Beans did present evidence that they had cleaned the house to some extent as of the day of the TPR hearing, we have previously held that evidence presented at a TPR hearing that parents have made overtures toward participating in the case plan while TPR is looming is an insufficient reason to not terminate parental rights. Ark. Code Ann. § 9-27-341(a)(4)(A); s*ee Wilson v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 666, 476 S.W.3d 816. In determining "little likelihood," the trial court considered the entire history of the Beans' involvement with ADHS, including their multiple engagements with ADHS due to environmental and medical neglect since 2002, and the fact that they had surrendered custody of six other children to relatives. We hold that the evidence before us supports the trial court's finding that there was little likelihood that continued services would remedy the Beans' circumstances and for them to sustain the improvement to an extent acceptable to foster reunification.

### C. Best Interest Finding—Potential Harm

The Beans focus on what Meyer said in regard to potential harm, which was only that she had concerns about the children gaining weight if returned home to the Beans and that the home, in the worst state that she had seen it presented, potential harm to the children. The Beans urge that this evidence, as previously discussed, does not support

Meyer's continuing concerns. They note that the children's fluctuations in weight were a problem for the foster parents as well, and they submit that their home simply had not posed a health-and-safety issue to the children in a year. They urge that it does not matter what the worst state of the home was when it existed long before the TPR hearing. The Beans question what more they could do to demonstrate that they were capable of maintaining their progress other than to keep their home free of health-and-safety hazards for a year. Accordingly, they claim that any concerns Meyer continued to have were unreasonable and that any finding that the children were at risk of potential harm was not supported by the evidence.

We disagree and reiterate that there is no requirement to identify the specific potential harm. Section 9-27-341(b)(3) requires that the TPR decision be based upon a finding, by clear and convincing evidence, that TPR is in the children's best interest while *considering* the potential for harm to the children's health and safety if the children were returned to the parent. The trial court must only find by clear and convincing evidence that TPR is in the children's best interest, giving consideration to the likelihood of adoption and the risk of potential harm. The likelihood of adoption and the risk of potential harm are merely factors for the court to consider in its analysis.

In making the decision whether to terminate parental rights, the trial court has a duty to look at the case as a whole and how the parent has discharged his or her parental duties, the substantial risk of serious harm the parent imposes, and whether the parent is unfit. *In re K.M.C.*, 62 Ark. App. 95, 969 S.W.2d 197 (1998). Our supreme court has held that this "harm analysis" should be conducted in broad terms and in a forward-looking manner. *See*

*Bearden v. Ark. Dep't of Human Servs.*, 344 Ark. 317, 42 S.W.3d 397 (2001); *Dowdy v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 180, 314 S.W.3d 722;. This includes the harm the child suffers from a lack of a stable and permanent home. *Rossie-Fonner v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 29, 388 S.W.3d 38.

We hold that the trial court clearly considered the potential harm these children would face if returned to the Beans and correctly found TPR to be in their best interest. The circuit court found that the Beans failed to remedy the conditions that caused the initial removal; accordingly, the children would be at risk of potential harm for the very same reason they were initially removed. Additionally, C.B. 4 would face potential harm based on the parents' inability to benefit from all the prior ADHS supervision and other services and be the fit parents he needed. The trial court rightly relied on the record of the parents' level and consistency of compliance in the entire dependency-neglect case and evidence presented at the TPR hearing in making its decision whether it was in the children's best interest to terminate parental rights. Ark. Code Ann. § 9-27-341(a)(4)(B). The Beans' history with ADHS over fourteen months gave the trial court no assurances that all four of the children would be safe from recurring environmental- and medical-neglect issues or that the Beans would consistently apply the parenting skills they allegedly learned during ADHS services.

Furthermore, this court can affirm the trial court's decision for any reason so long as it is correct. *Alexander v. Chapman*, 299 Ark. 126, 771 S.W.2d 744 (1989). The evidence at the TPR hearing undisputedly indicated that the Beans were in no position to have the children returned to their custody at the time of TPR because the lease on their home was

set to expire, and they had not secured new living arrangements. Without the ability to provide a stable home—let alone an environmentally safe home—the Beans would again expose the children to potential harm. The evidence of Mr. Bean's continued financial and employment instability also supports the trial court's finding of potential harm.

After considering the potential harm, the trial court correctly found that TPR was in these children's best interest. The three older children had been in foster care for fourteen months at the time of the TPR hearing with no clear plan for reunification, and C.B. 4 had been subsequently adjudicated dependent-neglected as well. Further delay would go against the clear legislative intent of the TPR statute, which is to provide permanency in a time frame consistent with the child's development, not the parent's. *Linker-Flores v. Ark. Dep't of Human Servs.*, 364 Ark. 224, 217 S.W.3d 107 (2005). Stability and permanence for children are the objectives of the TPR procedure, and living in continued uncertainty is itself potentially harmful to children. *See Bearden*, *supra*.

Affirmed.

GRUBER, C.J., and BROWN, J., agree.

*Leah Lanford*, Ark. Pub. Defender Comm'n, for appellant.

*Andrew Firth*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor children.