BRANDON J. HARRISON, Judge
Stephanie McHenry appeals the Union County Circuit Court's termination of her parental rights to C.H.1, C.H.2, C.H.3, and C.M. We affirm.
I. Background
This case started when the Arkansas Department of Human Services (DHS) received a child-maltreatment report after the meconium of Stephanie McHenry's fourth child tested positive for marijuana in February 2016. Services were started for the family, and a Union County social worker checked regularly on the children. There were concerns that Stephanie's eldest son, C.M., age 15, was babysitting the children-including C.H.3, an infant who had just been released from Arkansas Children's Hospital after a lengthy stay following his premature birth. More childcare and other services were provided, but on 3 August 2016, Stephanie had a positive drug test with "faint lines" for amphetamines, and she admitted that she had used methamphetamine.
The children were adjudicated dependent-neglected on 9 January 2017 based primarily on Stephanie's positive drug test and a lice infestation. The court ordered Stephanie to submit to random drug screens, successfully complete parenting classes and psychotherapy counseling, successfully attend NA/AA meetings, maintain housing, allow the DHS access to the home, obtain employment, and maintain regular contact with the juveniles. In March 2017, the court ordered Stephanie to follow "Loren Beck's plan for substance abuse treatment" and not to use or possess alcohol.
On 6 April 2017, the court ordered alternating weekend visitation between the children and Stephanie-ordering Stephanie not to smoke or "have the odor of smoke on her during the weekend visits." On 1 May 2017, the court entered an agreed order of a 60-day trial visit between Stephanie and C.H.1.
On 6 July 2017 DHS filed a motion for ex parte emergency custody, alleging "circumstances have changed since the entry of the most recent temporary custody order concerning [C.M.] and [C.H.1]." DHS alleged that Stephanie had been drinking on July 4 in violation of the court's order, and was involved in a "domestic dispute with Jonathan Keanobody,[1] someone she said she was not in a relationship with and had taken off in the middle of the night walking with her three (3) youngest children in the woods." An attached affidavit by a DHS caseworker detailed the events of the night. The court entered an order of emergency change of custody on July 11.
A review order was entered on 12 July 2017. It reflected that C.H.1 started a trial visit on May 15 and C.M. started a trial *773 visit on May 22, before the emergency order changing custody back to DHS was entered on July 11. The court entered a permanency-planning order on 6 October 2017, which changed the case goal to adoption. DHS filed a petition for termination of parental rights on 12 September 2017, alleging two statutory grounds-the 12-month ground and the aggravated-circumstances ground. Ark. Code Ann. §§ 9-27-341(b)(3)(B)(i)(a) and (b)(3)(B)(ix)(a) (Supp. 2017).
II. Termination Hearing
The circuit court convened a hearing on DHS's termination petition on 16 October 2017. We have reviewed the record and all the testimony but have included only the most critical parts.
Stephanie's alcohol-and-drug counselor, Loren Beck, testified that he recommended intensive outpatient therapy for Stephanie after an initial assessment spun by the 2016 child-maltreatment report. Stephanie completed treatment but there were problems along the way. For example, in December 2016 Stephanie admitted drinking around the holidays. Drinking was not allowed under Beck's treatment plan. Beck restarted his plan with Stephanie in February 2017, and again in mid-April. Beck discharged Stephanie from treatment after she completed "a very client-specific plan" in May 2017. After the July 4 incident, Stephanie completed eight-week interim services and remained active in the aftercare program, according to Beck. Beck's prognosis for Stephanie's sobriety was "guarded" because Stephanie "doesn't believe that she has a problem with alcohol or drugs."
On cross-examination, Beck stated that the court adopted his February 2017 recommendations that Stephanie abstain from alcohol, that he found out about Stephanie's boyfriend from the staffing, and that in mid-April 2017 Stephanie started to be open and honest about her life and treatment. Beck said that after the July 4 incident, Stephanie started going to lots of extra treatment, group meetings, and twelve-step meetings.
Molly Taylor, the foster mom to C.H.2 and C.H.3, testified that the children "went for a trial visit" around 19 June 2017 and returned to her home on July 4 or 5. Taylor reported that when C.H.2 and C.H.3 returned, they were dirty, covered in bug bites, and had lice and a few fleas on them. C.H.2 regressed in her toilet training and played with her urine. C.H.3 was a happy baby before the trial visit but after the visit had "a lot of anger" and "angry screams."
According to Taylor, the children came home with gifts; C.H.2 started having nightmares; and C.H.3 started having night terrors after an August visit at the DHS office. Taylor called DHS because she wasn't sure if something had triggered these behaviors, and she was told that Jonathan Hadlock had called during the visit. C.H.2 told Taylor that she had received a baby doll from "John John." Taylor assumed the nightmares and the doll were related so she did not allow C.H.2 to sleep with the doll and "eventually with time it got better." After returning from a parent visit in Monticello where C.M. lived, C.H.2 threw a tantrum and ripped the toenail off her big toe. Taylor reported that she was concerned with the tantrums and behaviors occurring after the visits with Stephanie and that the bags with snacks and diapers she packed for the children would come back unused. C.H.2 would tell her that she did not want to see John John.
On cross-examination, Taylor said that she believed John John is Jonathan Napp. She also said that before the July 4-5 event, C.H.2 was always happy to see Stephanie *774 and would cry when the weekend visits would end; but after July 5, C.H.2 would be eager for Taylor to pick her up from the visits and called Taylor "mommy." Taylor also said that C.H.3 had been diagnosed with asthma and shows signs of cerebral palsy. At the time of the termination hearing, he was twenty months old, not yet walking, and had some developmental delays. Taylor said that she had to replace C.H.3's air chamber because it was "full of cigarette smoke" after the July event.
Caseworker Lacie Waller testified that after the children's removal from the home on 3 August 2016, Stephanie agreed to a case plan that included a drug assessment and that she would "follow all recommendations." Waller said that she agreed with Beck's recollection of the staffing on 13 January 2017. Waller said that during the staffing, Stephanie admitted that she drank three times and said that she didn't know she was not allowed to drink. Waller also said that during a visit in February 2017, Jonathan Napp told her that he had not done a background check and that "he wasn't gonna do it because [he] was gonna let [Stephanie] get her life together and he wasn't gonna be around the kids so she could eventually get them back."
Waller testified that she went to the trailer park where Stephanie lived and that she had no concerns with the children's health or safety based on the home's conditions. Waller reported that Stephanie had missed six of her drug-treatment classes in mid-March but that at the next staffing on April 4, Beck reported that Stephanie was "still in IOP classes but that she had completed them but he still wanted her to go twice a week." She said that the court ordered Stephanie not to smoke because C.H.3 has asthma. C.H.2 and C.H.3 were placed on a trial visit with Stephanie on June 19, which DHS terminated after Waller received a text from Jonathan Napp, who said that Stephanie "was belligerent and drunk and she had taken the kids into the woods" and that Waller needed to come. Waller described Stephanie's home as "in disarray" and there were liquor bottles in the house.
When Waller arrived at the house that night, Stephanie and the children were not there. About five minutes later, Stephanie and the children arrived in a car driven by Stephanie's mother. Waller questioned Stephanie about her drinking, and Stephanie said she drank three and a half beers. It appears that all the children were placed with Stephanie at that time, although the orders in the record do not reflect this. Waller testified that after this incident, C.H.2 and C.H.3 were put back into foster care and C.M. and C.H.1 were put back in a 72-hour hold.
Waller testified that a September staffing was convened during which Stephanie reported that she had missed her counseling appointment because Jonathan Hadlock had stolen her car, that she was no longer working, that Jonathan Napp and her mother helped with the bills, that they had no money in their account, but Jonathan was being paid the next day. Waller also said that there had been issues during the last three to four visits between Stephanie and her children. She said that one of the issues was with Stephanie not properly feeding C.H.3 but that Loretta Harrell supervised those visits. She also described some conflicts with C.M.'s phone. A foster parent had taken his cell phone away as punishment, and Waller returned the phone to Stephanie on August 22. Stephanie gave it back to C.M. by putting it in the foster parent's mailbox. She concluded it was in the children's best interest to terminate Stephanie's parental rights.
On cross-examination by Stephanie's counsel, Waller agreed that she did not *775 have proof that Stephanie had been using alcohol since July 4. On cross-examination by the attorney ad litem, Waller stated that Stephanie had lied about her relationship with Jonathan Napp and pretended she was not in a relationship with him. Waller said that custody of C.M. was returned to Stephanie on June 19.[2] According to Waller, Stephanie let C.M. stay "at Ms. Bohannon's house" a week or two after his return (which might explain why he wasn't with her during the July 4 incident). Stephanie also let C.H.2 and C.H.3 stay with Jonathan Hadlock. She never gave DHS his phone number or asked if it was ok for Hadlock to take the children. Waller also explained that the foster parent called after the Monticello visits because there were problems when Stephanie had ridden to Monticello with C.H.2 and C.H.3. The Monticello visitations were stopped and moved to the DHS office in Union County instead.
DHS supervisor Mydeana Bridges testified that between March and August 2016, DHS provided drug-screening services, drug assessments, transportation, a gas card, and homemaker services. She explained that C.H.3 had missed critical appointments at Arkansas Children's Hospital in Little Rock and that Stephanie would go to work and leave C.M. in charge of all three children. She said that Jonathan Napp never provided the background checks and forms that he was asked and ordered to provide. Loretta Harrell, a DHS program assistant, testified that there were issues with Stephanie's visitation with the children. DHS presented a piece of hard candy as evidence. Harrell also said that Stephanie did not give C.H.3 "the thickening and the milk" that was in the backpack during the visits.
Crystal Williams, a Union County adoption specialist, testified that the children have "medical things but that would not hinder finding homes." She said that she ran matching information on the children and came up with 35 possible families, and to her knowledge, there was not anyone known to DHS who might want to adopt the children.
Stephanie denied not properly feeding C.H.3 or the other children and explained that she did not use the food provided because she brought peanut butter and jelly sandwiches or chips and apple juice for C.H.3. She disagreed that C.H.2 called Jonathan Napp "John John," as he had been around the children only a few times. According to Stephanie, C.H.2 called him "Jonathan the trucker guy." In Stephanie's opinion, her children's problematic behavior was not because of Jonathan but because "[her] kids are going back and forth to [her] and [she was] only seeing them once a week for an hour."
Stephanie thought the kids got lice from Jonathan Hadlock and that it was her mistake. She also explained that her kids being dirty and having bites was from being outside playing and shooting fireworks. She said she lied "a lot" at the beginning of the case because she feared DHS and losing her kids. She testified that she was "very ashamed and embarrassed" and that she did not want to tell Jonathan about "all this" as she "knew that DHS would drag him into it." She said that she was blaming everyone but herself but "became honest." Stephanie testified that Jonathan was helping her get her GED and that she was to start a job at Foster Farms the next day.
She denied having a drinking problem. According to Stephanie, she only drinks at holidays and special occasions, and the *776 Fourth of July was a "huge mistake." She testified,
It's not so much of me having the drinking problem not to where I need a drink every day or once or week, it's just when I do drink on a holiday then it's too much .... [T]hat's why I'm continuing to do AA and listen to everybody else's story .... I can be in a really bad mood and upset and then when I go to AA it clears my mind[.]
On cross-examination, Stephanie said, among other things, that she was on step four of the twelve steps. She started attending meetings in August 2017, a few months before the October termination hearing.
III. The Circuit Court's Ruling
The circuit court terminated Stephanie's parental rights in December 2017. It found that DHS had proved by clear and convincing evidence the statutory ground of aggravated circumstances, and there was little likelihood that further services would result in successful reunification. It wrote,
[DHS] showed that Stephanie McHenry began to comply late in the game and the Court cannot gauge how long it will take for her to get to the point of the children being able to return home. Prior to the children being returned home, custody and/or trial visit, Stephanie McHenry testified that she did not have a relationship with Jonathan Knapp, which was not true. On July 4, 2017 the children were brought back into foster care because Stephanie McHenry and Mr. Knapp were drinking, left with the kids and only showed up later after the police and DHS had left and came back. Stephanie McHenry continues to have a substance abuse issue.
Stephanie McHenry did not start going to NA/AA meetings until August 28, 2017. There is a strong record that Stephanie McHenry has not completed any services offered after the children were removed in July. The Court cannot hold up the lives of the children to see how long it will take her. The Court finds Stephanie McHenry has been untruthful during the case. The Court finds her stated reasons for this untruthfulness reasonable, but problematic in this case.
The condition of the children after being removed from her home in July were totally unexplained by Stephanie McHenry. Before the return to Stephanie McHenry's home, [C.H.2] was happy to visit and after the placement she reacted differently. Stephanie McHenry should be in a position to explain what happened during the trial placement but did not. The Court finds that whatever happened was detrimental to [C.H.2].
....
The Court finds that the unknown nature about what occurred while the children were home until July 4, that it was detrimental to them and Stephanie McHenry's inability to explain the situation demonstrate how [C.H.1, C.H.2, C.H.3, and C.M.] would be at risk of potential harm if returned to Stephanie McHenry.
IV. Arguments on Appeal
Stephanie first argues that the circuit court lacked "subject matter jurisdiction" to entertain DHS's termination petition because the court lacked jurisdiction to enter an order adjudicating the children dependent-neglected. She asks us to reconsider our holding in Turner v. Arkansas Department of Human Services , 2018 Ark. App. 52, 539 S.W.3d 635 for three primary reasons: (1) Ark. Code Ann. § 9-27-327(f) states that the circuit court "shall" enter a written adjudication order within thirty days of the hearing or prior to the next hearing, whichever is sooner; (2) "encouragement"
*777 by the appellate courts for the circuit courts to follow the statute does not adequately address the growing problem of delayed orders; and (3) Turner 's statement that "[t]o reverse ... would be contrary to the [child's] best interest" ignores the statute's mandatory directives and negatively impacts the rights of parents to seek appellate review.
We decline to overrule Turner . In this case, the children were removed from Stephanie's home on 3 August 2016 and remained in DHS custody, but the circuit court did not adjudicate them dependent-neglected until 9 January 2017. The January 9 adjudication order was not appealed. Turner holds that a parent must appeal an untimely adjudication order to argue about its untimeliness. Turner , 2018 Ark. App. 52, at 4, 539 S.W.3d at 637. In dicta we also said that a parent must at least raise the timeliness issue at the termination hearing. Id. Neither our supreme court nor the General Assembly has fashioned a remedy for untimely orders; and it is not our place to do so in this case. We therefore affirm on this point.
Stephanie's second point is that there is insufficient evidence to support the aggravated-circumstances termination ground. "Aggravated circumstances" means, among other things, that a determination has been made by a judge that there is little likelihood that services to the family will result in successful reunification. Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)(a)(3)(B)(i) (Supp. 2017). Our task is to ask whether the circuit court's finding of aggravated circumstances was clearly erroneous. Abdi v. Ark. Dep't of Human Servs. , 2018 Ark. App. 173, at 8, 544 S.W.3d 603, 607 (standard of review).
Here, the circuit court found that there was little likelihood that services would result in successful reunification between Stephanie and her children. Stephanie argues this finding is clearly wrong because she took advantage of the services DHS offered and that she responded to those services throughout the case, not just after the July 4 incident, which was an isolated event.
When deciding whether to terminate parental rights, the circuit court must look at the case as a whole and how the parent has discharged his or her parental duties, the substantial risk of serious harm the parent imposes, and whether the parent is unfit. Bean v. Ark. Dep't of Human Servs. , 2017 Ark. App. 77, at 28, 513 S.W.3d 859, 876. See also Ark. Code Ann. § 9-27-341(a)(4)(B). Time is viewed from the children's perspective; and the best interests of the children take precedence at every stage of the proceedings. Burkett v. Ark. Dep't of Human Servs. , 2016 Ark. App. 570, at 5, 507 S.W.3d 530, 534.
DHS had been providing services for twenty months at the time of the termination hearing. Stephanie completed several courses of substance-abuse treatment but still had an event where she drank alcohol in violation of a court order, left suddenly into the woods with three children, and therefore undermined the progress she had made. At that time, the family was already a year into the case, and there was not much time left to recoup her progress after such a failure. During the termination hearing, Stephanie equivocated on whether she had a problem with substance misuse, and her therapist, Loren Beck, said that his prognosis for sobriety was guarded because Stephanie had little insight into her problem. The court was faced with a difficult call of whether it thought Stephanie was going to "get there" and how long it would take her to *778 "get there." A parent must conquer his or her issues in a manner timely enough to prevent termination under the child-centered juvenile code. Given the whole of the testimony and the long history leading up to the termination, the circuit court's decision was not clearly wrong.
Stephanie takes issue with some of the court's written findings in its termination order. For example, she says that the court's language that "whatever happened was detrimental to [C.H.2]" was an unfair blaming of her for her child's behavior. She states,
The court also blamed Stephanie for being unable to explain why [C.H.2] acted adversely after being removed from Stephanie's custody after the July 4 incident, finding that "whatever happened" was detrimental. However, Stephanie did attempt to explain, as best she could, why her daughter, who was only three years old, might be acting adversely. How was she to explain the root cause of [C.H.2]'s change in behavior when there was no definitive evidence that something other than being placed back in foster care caused her to have behavioral issues? Clearly, the court cannot blame Stephanie for a three-year old's tantrums-and then terminate-based on circumstances that even the court isn't certain of. "Whatever happened" cannot support termination.
The court's finding is not unmoored from the record. It had before it testimony from C.H. 2's and C.H.3's foster mom about concerning behaviors that arose after they had contact with Stephanie-like a three-year-old ripping off her toenail or a previously happy baby having "angry screams." During the time Stephanie had custody or visitation from June 19 to July 5, she left the younger children with Jonathan Hadlock. C.H.2 reportedly told her foster mother that did not want to see "John John." Two of the men Stephanie was in contact with were named Jonathan. While she admitted lying about her relationship with Jonathan Napp, she married him and DHS had not received any of the background-check forms it had requested. Jonathan Hadlock had reportedly stolen Stephanie's car and had not been screened as an appropriate caregiver for the children.
We further acknowledge that the court's statement in the termination order that "[t]here is a strong record that Stephanie McHenry has not completed any services offered after the children were removed in July" is not completely accurate. Loren Beck testified that Stephanie had completed eight-week "interim services" and has remained active in the aftercare program after the July 4 incident. There was also no evidence of any alcohol or substance abuse after the July 4 incident and the children's emergency removal. In fact, Stephanie had no positive drug test since August 2016, when the children were first removed. We also note that while the circuit court wrote that the "condition of the children after being removed from her home in July [was] totally unexplained by Stephanie McHenry," Stephanie did provide explanations about her children's condition and their behavior following the visits. Whether those explanations were convincing was a credibility issue for the circuit court to decide.
The circuit court's decision to terminate Stephanie's rights was not clearly erroneous given this case's facts.
Affirmed.
Gruber, C.J., and Brown, J., agree.

This appears to be a typographical error. Jonathan's last name is Napp. Different spellings of this last name appear throughout the record. A former boyfriend of Stephanie appears in the record at times, and his name is Jonathan Hadlock.

There is no circuit-court order reflecting a change of custody.